Harold **WEISBERG**, Appellant,

v.

**U. S. DEPARTMENT OF JUSTICE.**

No. 71-1026.

United States Court of Appeals, District of Columbia Circuit.

On Rehearing En Banc.

Decided Oct. 24, 1973.

---

Bernard Fensterwald, Jr., Washington, D. C., with whom James H. Lesar, Washington, D. C., was on the brief, for appellant.

Walter H. Fleischer, Atty., Dept. of Justice, with whom Asst. Atty. Gen. L. Patrick Gray, III, at the time the brief was filed, Thomas A. Flannery, U. S. Atty., at the time the brief was filed, Harold H. Titus, Jr., U. S. Atty., and Barbara L. Herwig, Atty., Dept. of Justice, were on the brief, for appellee. Alan S. Rosenthal, Atty., Dept. of Justice, also entered an appearance for appellee.

Before: BAZELON, Chief Judge, DANAHER, Senior Circuit Judge, WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

## ON REHEARING EN BANC

DANAHER, Senior Circuit Judge:

Relying upon 5 U.S.C. § 552(a)(3) of the Freedom of Information Act, appellant in the district court sought to compel disclosure of certain materials [1] com-

---

1. The appellant's complaint in paragraph 6 had alleged that after the assassination of President Kennedy on November 22, 1963, the Federal Bureau of Investigation had spectrographically analyzed and compared the following items:

a) the bullet found on the stretcher of either President Kennedy or Governor

piled by the Federal Bureau of Investigation following the assassination of the late President Kennedy. Appellant argued that he is a professional writer who has published four books treating of the Kennedy assassination. The Department of Justice moved that the complaint be dismissed or, alternatively, for summary judgment, predicating its position upon Section 552(b)(7) of the Act which, as here pertinent, provides:

(b) This section shall not apply to matters that are

\* \* \* \* \* \*

(7) investigatory files compiled for law enforcement purposes . . . .

The district court without opinion granted the Department's motion to dismiss.[2] We are satisfied that the record before us clearly demonstrates the desired materials[3] were part of the investigatory files compiled by the FBI for law enforcement purposes, and, as such, are exempt from the disclosure sought to be compelled. Accordingly, we affirm.[4]

## I.

President Kennedy was pronounced dead at 1:00 p. m. on Friday, November 22, 1963. That day, at 2:38 p. m., Lyndon B. Johnson was sworn in as the thirty-sixth President of the United States and immediately by plane left Texas for Washington.

Director Hoover testified before the Warren Commission that

When President Johnson returned to Washington he communicated with me within the first 24 hours and asked the Bureau to pick up the investigation of the assassination because as you are aware, there is no federal jurisdiction for such an investigation. It is not a Federal crime to kill or attack the President or Vice President or any of the continuity of officers who would succeed to the presidency.

Appellant has argued on brief that the FBI materials could not have been compiled for law enforcement purposes since, in 1963 the State of Texas but not United States "had jurisdiction over the crime."[5] He thus contended that he was

---

John Connally of Texas (Identified as Exhibit 399 of the President's Commission on the Assassination of President Kennedy, hereafter referred to as the Warren Commission);

b) bullet fragment from front seat cushion of the President's limousine;

c) bullet fragment from beside front seat;

d) metal fragments from the President's head;

e) metal fragment from the arm of Governor Connally;

f) three metal fragments recovered from rear floor board carpet of limousine;

g) metal scrapings from inside surface of windshield of limousine; and

h) metal scrapings from curb in Dealey Plaza which was struck by bullet or fragment.

2. Following argument of Weisberg's appeal, the respective opinions of a divided court were vacated when we entered our order for rehearing *en banc*.

3. Prior to the institution of this action the Attorney General had denied appellant's application for administrative relief wherein he described as "records" the following:

Spectrographic analysis of bullet, fragments of bullet and other objects, including garments and part of vehicle and curbstone said to have been struck by bullet and/or fragments during assassination of President Kennedy and wounding of Governor Connally.

4. The appellant chose not to counter the Department's affidavit filed in support of its Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief could be granted, or alternatively, for summary judgment. No material issue of fact was presented in any event. *See* Irons v. Schuyler, 151 U.S.App.D.C. 23, 28, 465 F.2d 608, 613, cert. denied, 409 U.S. 1076, 93 S.Ct. 682, 34 L.Ed.2d 664 (1972); *cf.* Carter v. Stanton, 405 U.S. 669 at 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *and see* Nichols v. United States, 460 F.2d 671, 675 (10 Cir.), cert. denied, 409 U.S. 966, 93 S.Ct. 268, 34 L.Ed.2d 232 (1972).

5. Congress by Pub.L. 89-141 approved August 28, 1965, 18 U.S.C. § 1751, prescribed penalties to apply in cases of assassination of a president and other identified officers and dealt with conspiracies to accomplish any such proscribed offense.

"entitled to the sought material as a matter of law and not as a matter of grace."

Clearly, in the day and time of it all, the President contemplated collaboration with Texas authorities by agents of the Secret Service and of the Federal Bureau of Investigation looking to the early apprehension and ultimately the conviction of whoever murdered President Kennedy. It was speedily developed that the rifle from which the assassin's bullets had been fired had been shipped to one Lee Harvey Oswald. The latter was placed under arrest and charged with the perpetration of the crime. Two days later, as an investigation of massive proportions got under way, Oswald, then in the custody of Dallas Police, was fatally shot by one Jack Ruby.

Director Hoover further testified before the Warren Commission [6] thus:

However, the President has a right to request the Bureau to make special investigations, and in this instance he asked that this investigation be made. I immediately assigned a special force headed by the special agent in charge at Dallas, Texas, to initiate the investigation, and to get all details and facts concerning it, which we obtained, and then prepared a report which we submitted to the Attorney General for transmission to the President. [Hearings before the Warren Commission, Vol. 5, p. 98.]

To glean some understanding of the magnitude of the investigatory organization which was speedily activated, we may turn to the Foreword of the Warren Commission Report, xii, from which we quote:

The scope and detail of the investigative effort by the Federal and State agencies are suggested in part by statistics from the Federal Bureau of Investigation and the Secret Service. Immediately after the assassination more than 80 additional FBI personnel were transferred to the Dallas office on a temporary basis to assist in the investigation. Beginning November 22, 1963, the Federal Bureau of Investigation conducted approximately 25,000 interviews and reinterviews of persons having information of possible relevance to the investigation and by September 11, 1964, submitted over 2,300 reports totaling approximately 25,400 pages to the Commission. During the same period the Secret Service conducted approximately 1,550 interviews and submitted 800 reports totaling some 4,600 pages.

 We deem it demonstrated beyond peradventure that the Department's files: (1) were investigatory in nature; and (2) were compiled for law enforcement purposes.[7] When that much shall have been established, as is so clearly the situation on this record, and the district judge shall so determine, such files are exempt from compelled disclosure.

II.

While the statute speaks for itself in the respect under consideration, we may note that the legislative history additionally explains:

It is also necessary for the very operation of our Government to allow it to keep confidential certain material, such as the investigatory files of the Federal Bureau of Investigation.[8]

6. By Executive Order No. 11130, 28 Fed.Reg. 12789 (1963), President Johnson appointed a Special Commission under the Chairmanship of Chief Justice Warren "to examine the evidence developed by the Federal Bureau of Investigation and any additional evidence that may hereafter come to light or be uncovered by federal or state authorities." Congress cooperated and passed Public Law 88–202, approved December 13, 1963, authorizing the Commission to require the attendance of witnesses and the production of evidence.

7. We are not at this point concerned with the "except" clause of subsection (7) which protects the Department's files "except to the extent available by law to a party other than an agency." See the definition of "party" in 5 U.S.C. § 551(3) and note 15, infra.

8. S.Rep.No.813, 89th Cong., 1st Sess., at 3 (1965); see also H.R.Rep.No.1497, 89th

In slightly different context to be sure, Judge Hays analyzed the Congressional purpose thus:

If an agency's investigatory files were obtainable without limitation after the investigation was concluded, future law enforcement efforts by the agency could be seriously hindered. *The agency's investigatory techniques and procedures would be revealed.* The names of people who volunteered the information that had prompted the investigation initially or who contributed information during the course of the investigation would be disclosed. The possibility of such disclosure would tend severely to limit the agencies' possibilities for investigation and enforcement of the law since these agencies rely, to a large extent, on voluntary cooperation and on information from informants.[9] (Emphasis added).

There can be no question that 5 U.S.C. § 552 had as its principal purpose that there was to be disclosure to the public of the manner in which the Government conducts its business. Congress additionally was concerned with the dilemma in which the public finds itself when forced to "litigate with agencies on the basis of secret laws or incomplete information."[10] We have repeatedly made evident our appreciation of the principle that generally disclosure, and not withholding, of information is called for, especially where there is an adversarial posture presented as in Bristol-Myers Co. v. FTC, 138 U.S. App.D.C. 22, 25, 424 F.2d 935, 938, cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L. Ed.2d 52 (1970).[11] But the remedy appropriately provided in § 552(a)(3) is not available in every situation, and as we have previously noted, § 552(b) is explicit that § 552 does not apply to matters that are specifically exempted.

We are not here speaking of trade secrets, or personnel and medical files, or patent information or internal revenue returns, or yet other material which, by statute (*see, e. g.,* 41 CFR § 105–60.604, 1972), had been specifically exempted from disclosure. We are not treating of geological information or matter required by Executive order to be kept secret. We are not discussing any problem except that of compelled disclosure of Federal Bureau of Investigation investigatory files ** compiled for law en-

---

Cong., 2d Sess., at 6 (1966). EPA v. Mink, 410 U.S. 73, 80, n. 6, 92 S.Ct. 827, 35 L.Ed. 2d 119 (1973), Frankel v. Securities and Exchange Commission, 460 F.2d 813, 817, (2 Cir.), cert. denied, 409 U.S. 882, 93 S.Ct. 125, 34 L.Ed.2d 146 (1972); *and see* Cowles Communications, Inc. v. Department of Justice, 325 F.Supp. 726, 727 (N.D.Cal.1971), (where *in-camera* inspection was directed only to ascertain whether or not there was an investigatory file compiled for law enforcement purposes). *And see* Evans v. Department of Transportation of United States, 446 F.2d 821, 824, n. 1, (5 Cir. 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 984, 30 L.Ed.2d 788 (1972) and N. L. R. B. v. Clement Brothers Co., 407 F.2d 1027 (5 Cir. 1969).

9. Frankel v. Securities and Exchange Commission, *supra*, note 8, 460 F.2d at 818.

10. Bannercraft Clothing Company, Inc. v. Renegotiation Board, 151 U.S.App.D.C. 174, 181, 466 F.2d 345, 352 (1972) cert. granted, 410 U.S. 907 (1973); *and see* American Mail Line Ltd. v. Gulick, 133 U.S.App.D.C. 382, 411 F.2d 696 (1969); *see also* Grumman

Aircraft Engineering Corp. v. The Renegotiation Board, 157 U.S.App.D.C. 121, 482 F.2d 710 (1973).

11. *And see,* generally, our discussion in Getman v. National Labor Relations Board, 146 U.S.App.D.C. 209, 218, 450 F.2d 670, 679–680 (1971); Sterling Drug, Inc. v. Federal Trade Commission, 146 U.S.App.D.C. 237, 244, 450 F.2d 698, 705 (1971); Soucie v. David, 145 U.S.App.D.C. 144, 154, 448 F.2d 1067, 1077 (1971); Irons v. Schuyler, 151 U.S.App.D.C. 23, 465 F.2d 608, cert. denied, 409 U.S. 1076, 93 S.Ct. 682, 34 L.Ed.2d 664 (1972); Grumman Aircraft Engineering Corp. v. Renegotiation Board, 138 U.S.App. D.C. 147, 425 F.2d 578 (1970).

Nothing in the foregoing cases runs counter to the Supreme Court's treatment in EPA v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

** Attorney General Richardson, acting pursuant to Title 28 U.S.C. Section 509, by Order No. 528–73, July 11, 1973, 38 Fed.Reg. No. 136, 19029, [and see 5 U.S.C. § 301] has amended earlier regulations relating to materials exempted from compulsory disclo-

forcement purposes. Certainly the answer does not depend upon what this appellant desires to accomplish if access be afforded. The Court has told us that the Act does not "by its terms, permit inquiry into particularized needs of the individual seeking the information." EPA v. Mink, 410 U.S. at 86, 93 S.Ct. at 835. Against the background we have hereinbefore set out, we may appropriately turn, particularly as a frame of reference, to the correspondence between the appellant and the Department prior to the institution of this action.

This appellant, in his letter of May 16, 1970 attached as an exhibit to his complaint, submitted to the Department of Justice the following:

> With regard to the spectrographic analysis, if you are not aware of it, not then having been in your present position, I think you should know that if it does not agree in the most minute detail with the interpretation put upon it by the Warren Commission, their Report is a fiction.

Appellant then transmitted the Department's form entitled "Request For Access To Official Record Under 5 U.S. C. 552(a) and 28 CFR Part 16," describing the material set forth in our footnote 3, *supra*. A further exhibit attached to the appellant's complaint discloses that the Department under date of June 12, 1970, wrote:

> *Spectrographic Analyses:* You have asked for access to the spectrographic

analyses conducted on certain bullet evidence involved in the assassination.

I regret that I am unable to grant your request in that the work notes and raw analytical data on which the results of the spectrographic tests are based are part of the investigative files of the FBI and are specifically exempted from public disclosure as investigatory files compiled for law enforcement purposes. 5 U.S.C. 552(b) (7). The results of the spectrographic tests are adequately shown in the report of the Warren Commission where (Volume 5, pages 67, 69, 73 and 74) it is specifically set forth that the metal fragments were analyzed spectrographically and found to be similar in composition.

Our problem thus stems from what follows under the Freedom of Information Act after the Attorney General's exercise of the decisional process devolving upon him.

### III.

The Department of Justice, headed by the Attorney General, 28 U.S.C. § 503, includes the Federal Bureau of Investigation, 28 U.S.C. § 531. The Attorney General is directly charged under 28 U. S.C. § 534 with the duty to acquire, collect, classify and preserve identification, criminal identification, crime and other records, and to exchange such records with and for the official use of authorized officials, not only of the federal government, but of the States and cities. So it was that the Bureau collaborated with the Dallas police.[12]

sure under the Freedom of Information Act. "Possible releases that may be considered under this section are at the sole discretion of the Attorney General and of those persons to whom authority hereunder may be delegated." The Order provides for access to material within the Department's investigatory files compiled for law enforcement purposes "that are more than fifteen years old" subject to certain deletions which include "(4) *Investigatory techniques and procedures.*" (Emphasis added) *Compare* text quoted *supra*, and identified in Frankel v. Securities and Exchange Commission, 460 F.2d at 817–818, n. 9, *supra*.

12. Such cooperation regularly follows as a matter of duty in aid of law enforcement, indeed the magnitude of the effort, scarcely realized, has been delineated in Menard v. Mitchell, 328 F.Supp. 718, 721–722 (D.D.C. 1971), following our remand in that case, 139 U.S.App.D.C. 113, 430 F.2d 486 (1970).

Cf. Public Law 88–245, the Appropriations Act of 1964, providing funds for the Federal Bureau of Investigation for the "protection of the person of the President of the United States; acquisition . . . and preservation of identification and other records and their exchange with, and for the official use of, the duly authorized officials

Further appreciation of the daily activity of the Bureau may be seen in its annual report for 1972. The FBI had developed more than 345,000 items of criminal intelligence which had been disseminated to other Federal, state and local agencies engaged in law enforcement. More than 495,000 examinations of evidence had been conducted by the FBI laboratory to be submitted to law enforcement agencies. Organized crime investigations had ranged throughout the nation. Discretion respecting disclosure of the records in such matters devolved upon the Attorney General by virtue of 28 U.S.C. § 534. Moreover, under subsection (b) thereof, the exchange of records so gathered may be "subject to cancellation if dissemination is made outside the receiving departments or related agencies," Congress provided. It may to some appear *unthinkable* that the criminal investigatory files of the Bureau of Investigation, compiled for law enforcement purposes, are to be thrown open to some "person" as defined in 5 U.S.C. § 551(2) who asserts entitlement in reliance upon § 552(a)(3). Yet our appellant claims his "right" as a matter of law since in November, 1963, it was not a federal crime to kill a President. We need only surmise the consequences to law enforcement if any "person," knowing full well that an investigation has been conducted, can ask some federal court to compel disclosure of the Bureau's files.

Obviously, the statutory scheme of organization, as above referred to, calls for the exercise of discretion *by* the Attorney General respecting execution of the duties devolving upon him, and through him, upon the Federal Bureau of Investigation. We have no doubt whatever that Congress was fully alive to the problem where investigatory files of the FBI were involved.

■■ Congress knows full well that in the first instance an Attorney General in myriad situations must exercise the discretion conferred upon him by law. He must evaluate the evidence necessary to an informed judgment. He must decide whether to prosecute or not. He must decide whom to prosecute. He must decide when to prosecute. Functions in this area belong to the Executive under the Constitution, Article II, Sections 1 and 3, and, as here, specifically to the Attorney General under 28 U.S.C. § 509. Consider problems such as we find were assessed in Pugach v. Klein, 193 F.Supp. 630, 634–635 (S.D. N.Y.1961), and Moses v. Kennedy, 219 F.Supp. 762, 765 (1963), aff'd sub nom., Moses v. Katzenbach, 119 U.S.App.D.C. 352, 342 F.2d 931 (1965). As Judge Wright there said

. . . an investigation as to the adequacy or the execution of these laws is not a matter within the jurisdiction of the judicial branch of this Government.

And *see* Newman v. United States, 127 U.S.App.D.C. 263, 265, 382 F.2d 479, 481 (opinion by present Chief Justice Burger, 1967). The Attorney General's prosecutorial discretion is broad, indeed, and ordinarily at least, is not subject to judicial review. Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375, 380 (2 Cir. 1973); Powell v. Katzenbach, 123 U.S.App.D.C. 250, 359 F.2d 234 (D.C.Cir. 1965), cert. denied, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 349 (1966); Touhy v. Ragen, 340 U.S. 462, 467–469, 71 S.Ct. 416, 95 L.Ed. 417 (1951); cf. Adams v. Richardson, 156 U.S.App.D.C. 267, 480 F.2d 1159 (en banc, June 12, 1973); but we suggested that immunity respecting the exercise of discretion may well be unavailable were the Department to be under investigation by a court or grand jury when fraud or corruption might be involved, Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 385, 391, 463 F.2d 788, 794 (1971). But this much is certain, (5 U.S.C. § 301 as part of Pub.L. 89–554, 80 Stat. 379), the At-

---

. . . of States . . ., such exchange to be subject to cancellation if dissemination is made outside the receiving departments."

torney General, like the heads of other Executive departments, was authorized to refuse disclosure under Exemption 7 if he could determine as here that the issue involved investigatory files compiled for law enforcement purposes.

## IV.

Congress surely realized that disclosure was not to be required in certain prescribed classifications. For example, section 552(b) provided that the section as a whole was not to apply to matters that are (3) "specifically exempted from disclosure by statute." *See*, as illustrative, the statutes identified in 41 CFR § 105–60.604 (1972).

Again, section 552(b)(1) exempted from disclosure matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy." That very language gave rise to an issue which this court first considered, followed by the Supreme Court's definitive pronouncements as to the steps to be taken respecting disclosure of materials coming within section 552(b)(5). Ruling that we misapplied that section,[13] the Court reversed, EPA v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), observing at 82, 93 S.Ct. at 833 after a review of the legislative history,

> Rather than some vague standard, the test was to be simply whether the President has determined by executive order that particular documents are to be kept secret. The language of the Act itself is sufficiently clear in this respect, but the legislative history disposes of any possible argument that Congress intended the Freedom of Information Act to subject executive security classifications to judicial review at the insistence of anyone who might seek to question them.

Lest there be any doubt as to the Supreme Court's teaching respecting Exemption (b)(1), its opinion, 410 U.S. at 84, 93 S.Ct. at 834, emphasized:

> What has been said thus far makes wholly untenable any claim that the Act intended to subject the soundness of executive security classifications to judicial review at the insistence of any objecting citizen.

There was to be no room for challenge, no "balancing" function, no *in camera* inspection. Rather, upon the basis of the "showing and in such circumstances, petitioners had met their burden of demonstrating that the documents were entitled to protection under Exemption 1, and the duty of the District Court under § 552(a)(3) was therefore at an end." EPA v. Mink, 410 U.S. at 84, 93 S.Ct. at 835.

In that very case, strikingly different treatment was prescribed even as to executive materials claimed to be immune from disclosure under Exemption 5. EPA v. Mink, 410 U.S. at 85 et seq., 93 S.Ct. 827. The applicability of Exemption 7 no less will turn ultimately upon a determination by the district court [14] that disclosure is not required—as in the instant case.

Granted that the Attorney General may designate certain investigatory files as having been compiled for law enforcement purposes, his *ipse dixit* does not finalize the matter, for there remains the judicial function of determining whether that classification be proper. Where the district court can conclude that the Attorney General's designation and classification are correct, the Freedom of Information Act requires no more. Here the record overwhelmingly demonstrates how and under what circumstances the files were compiled and that indeed they were "investigatory files compiled for law enforcement purposes." When the District Judge made that determination, he correctly perceived that his duty in achieving the will

---

13. Mink v. Environmental Protection Agency, 150 U.S.App.D.C. 233, 464 F.2d 742 (1971).

14. Cf. Cowles Communications, Inc. v. Department of Justice, *supra*, n. 8. See generally the discussion in Vaughn v. Rosen, 157 U.S.App.D.C. 340, 484 F.2d 820 (Aug. 20, 1973).

of Congress under the Freedom of Information Act was at an end.[15]

Thus he ruled that there was no claim upon which relief could be granted, that there was no issue as to any material fact, and that the Department was entitled to judgment as a matter of law.[16] The action was thereupon dismissed.

Affirmed.

BAZELON, Chief Judge, dissenting:

In Environmental Protection Agency v. Mink,[1] Mr. Justice White, writing for a majority of the Court, reviewed the legislative history of one section of the Freedom of Information Act, that which exempts from disclosure "matters that are (1) specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy."[2] On the basis of the legislative history and the explicit statutory language, the majority concluded that "Congress chose to follow the Executive's determinations in these matters . . . . Rather than follow some vague standard, the test was to be simply whether the President has determined by Executive Order that particular documents are to be kept secret."[3]

In this case, appellant Weisberg seeks the following information:

> Spectrographic analysis of bullet, fragments of bullet and other objects, including garments and part of vehicle and curbstone said to have been struck by bullet and/or fragments during assassination of President Kennedy and wounding of Governor Connally.

---

15. This appellant also argued that if Oswald had lived and had been brought to trial, he would have had a legal right to the spectrographic analyses here in question, and accordingly Weisberg must be accorded an equal right. He based this claim upon so much of subsection (b)(7) as appears in the clause "except to the extent available by law to a party other than an agency." Aside from the fact that there was no such prosecution, Oswald's "right" would have been recognized only to the extent that the wanted material could have been "available by law," and then only to himself as a "party" as defined in § 551(3). This appellant does not come within the definition of "party." The import of this language was discussed in EPA v. Mink, 410 U.S. at 86, 93 S.Ct. at 835, indeed the Court would have allowed public access only to such materials as "a private party could discover in litigation with the agency." The short answer to appellant's claim in this respect is that he does not come within the terms of the Act. He was not engaged in litigation with an agency, and neither was Oswald.

16. *Cf.* Nichols v. United States, 460 F.2d 671 (10 Cir.), cert. denied, 409 U.S. 966, 93 S. Ct. 268, 34 L.Ed.2d 232 (1972).

Our appellant had sought to test the spectrographic analyses of materials (listed in our n. 3, *supra*) not unlike certain items listed in note 1 of Nichols, *supra*. There Nichols had sought to make his own scientific analysis of the described material, which the court found to be specifically exempted from disclosure by statute, pointing to § 552(b)(3). The opinion cited Pub.L. 89–318, 79 Stat. 1185, November 2, 1965, where the Attorney General acting in "the national interest" designated evidence considered by the Warren Commission to "be preserved." Such evidence pursuant to § 4 of that Act was to be placed under the jurisdiction of the Administrator of General Services for preservation under such rules and regulations as the Administrator might prescribe. (*See generally,* 41 CFR § 105–60.101, §§ 105–60.601, 60.602 and 60.604; and Vol. 11, Part 17, 23,002 Congressional Record, 89th Cong. 1st Sess., Sept. 7, 1965).

The court found—without more—that the rules and regulations are clearly within the grant of authority of Pub.L. 89–318, and that the materials sought by Nichols came within the exemption of § 552(b)(3).

[Special "Regulations Concerning Procedures for Reference Service on Warren Commission and Related Items of Evidence," National Archives Record Group 272, provide in subsection 5, in part, that materials which have been subjected to techniques of detailed scientific examination "will be withheld from researchers as a means of protecting them from possible physical damage or alteration and in order to preserve their evidentiary integrity in the event of any further official investigation of the assassination of President John F. Kennedy."]

1. 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

2. 5 U.S.C. § 552(b)(1) (1970).

3. 410 U.S. at 81–82, 93 S.Ct. at 833.

In response to Weisberg's request for this information, the Justice Department stated:

. . . that the work notes and raw analytical data on which the results of the spectrographic tests are based are part of the investigative files of the FBI and are specifically exempted from public disclosures as investigatory files compiled for law enforcement purposes. 5 U.S.C. 552(b)(7). The results of the spectrographic tests are adequately shown in the report of the Warren Commission where (Volume 5, pages 67, 69, 73 and 74) it is specifically set forth that the metal fragments were analyzed spectrographically and found to be similar in composition.

Thus, we deal in this case, not with Section 552(b)(1), but with Section 552(b)(7). The latter provision exempts from disclosure "matters that are . . . investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency." I have no doubt that, as Judge Danaher's majority opinion concludes, the information sought in this case is lodged in a file originally compiled for law enforcement purposes. I cannot, however, agree with the majority that this fact automatically brings the information within the ambit of Section 552(b)(7). There remains the question whether such information is to be considered as resting solely within an "investigative file" when the results of the spectrographic tests have been made public in the Warren Commission report and when there is no indication that the Government contemplates use of the information for law enforcement purposes.

The reasons that support my position are fully stated in Judge Frank Kaufman's [4] majority opinion for the

panel that originally heard this case, an opinion in which I concurred and which was withdrawn when the case was ordered to be reheard *en banc*. I set forth here the central part of Judge Kaufman's opinion: [5]

In Bristol-Myers Company v. F. T. C. [138 U.S.App.D.C. 22], 424 F.2d 935, 939–40 (D.C.Cir.), cert. denied, 400 U.S. 824 [91 S.Ct. 46, 27 L.Ed.2d 52] (1970), Chief Judge Bazelon, in reversing the grant of a motion to dismiss the plaintiff's Freedom of Information Act complaint, and in commenting upon the 5 U.S.C. § 552(b)(7) exemption, wrote: .

* * * [T]he agency cannot, consistent with the broad disclosure mandate of the Act, protect all its files with the label "investigatory" and a suggestion that enforcement proceedings may be launched at some unspecified future date. Thus the District Court must determine whether the prospect of enforcement proceedings is concrete enough to bring into operation the exemption for investigatory files, and if so whether the particular documents sought by the company are nevertheless discoverable.

In the within case, no criminal or civil action relating to the death of President Kennedy is pending nor is it indicated by the Government that any such future action is contemplated by anyone. Nor is Weisberg the subject of any investigation. He simply asks for information which he alleges he is entitled to have made available to him under 5 U.S.C. § 552(a)(3). The language of Section 552, supported abundantly by the legislative history of the Freedom of Information Act,[6] places the burden on the Government to show, why non-revelation

---

4. United States District Judge for the District of Maryland; Judge Kaufman sat in this case by designation pursuant to 28 U.S. C. § 292(d) (1970).

5. The footnotes of Judge Kaufman's opinion have been renumbered.

6. S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965), hereinafter cited as Senate Report. House Report at 5.

should be permitted, and requires that exemptions from disclosure be narrowly construed and that ambiguities be resolved in favor of disclosure. *See generally* Getman v. N. L. R. B. [146 U.S.App.D.C. 209], 450 F.2d 670, 672 (D.C.Cir. 1971); Soucie v. David [151 U.S.App.D.C. 144], 448 F.2d 1067, 1080 (D.C.Cir. 1971); Wellford v. Hardin, 444 F.2d 21, 25 (4th Cir. 1971); Bristol-Myers Company v. F. T. C., *supra* at 938–40; M. A. Shapiro & Co. v. Securities & Exchange Comm'n, 339 F.Supp. 467, 469, 470 (D.D.C.1972); *cf.* LaMorte v. Mansfield, 438 F.2d 448 (2d Cir. 1971) (Friendly, J.). In Wellford v. Hardin, *supra* at 25, Judge Butzner commented that 5 U.S.C. § 552(c) provides that the Act " 'does not authorize withholding of information or limit the availability of records to the public, except as specifically stated' " and noted Professor Davis' emphasis upon " '[t]he pull of the word "specifically" . . . .' " K. Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 783 (1967).

\* \* \* \* \* \*

. The Court below granted the Government's motion to dismiss, not its motion for summary judgment. Thus, it seemingly accorded no weight to the affidavit of Agent Williams.[7] But even if that affidavit is given full consideration, it is a document which is most general and conclusory and which in no way explains *how* the disclosure of the records sought is likely to reveal the identity of confidential informants, or to subject persons to blackmail, or to disclose the names of criminal suspects, or in any other way to hinder F.B.I. efficiency.[8] The conclusion that the disclosure Weisberg seeks will cause any of those harms is neither compelled nor readily apparent, and therefore does not satisfy the Department's burden of proving under 5 U.S.C. § 552(b)(7), as the Department must, some basis for fearing such harm.[9] Neither the F.B.I. nor

---

7. Weisberg contends that certain parts of the Williams' affidavit do not qualify for consideration under Federal Civil Rule 56. Those contentions, on remand, should, if Weisberg desires, be brought to the attention of the District Court.

8. An F.B.I. investigatory file may generally relate to organized or other crime and may not have been originally intended for use in the prosecution of any named individuals, or, even if so originally intended, may no longer be intended for such use. The data contained in such a file may, however, require the protection of secrecy so as not to dry up future sources of information or to pose a danger to the persons who supplied the information or to prevent invasion of personal privacy. 5 U.S.C. § 552(b)(7) would appear sufficiently flexible to include within its protection such an investigatory file when and if such protection is required. Frankel v. Securities & Exchange Commission, 460 F.2d 813 (2d Cir. 1972); Evans v. Department of Transportation, 446 F.2d 821, 823–824 (5th Cir. 1971), cert. denied, 405 U.S. 918, 92 S.Ct. 984, 30 L.Ed.2d 788 (1972); Cowles Communications, Inc. v. Department of Justice, 325 F.Supp. 726, 727 (N.D.Calif. 1971). In such instances, *in camera* inspection by the District Court might be appropriate. See discussion *infra* at n. [11].

9. "The burden of proof is placed upon the agency which is the only party able to justify the withholding." House Report at 9. *And see* the specific wording of 5 U.S.C. § 552(a)(3) . . . . While it may be that the introductory words of Section 552(b) make the burden of proof provisions of Section 552(a)(3) inapplicable in determining whether the Section 552(b) exceptions apply (*but see* the contrary approach taken in all opinions, majority, concurring and dissenting, in Environmental Protection Agency et al. v. Mink et al., 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), and the Ninth Circuit's seeming assumption to the contrary in Epstein v. Resor, 421 F.2d 930, 932 (9th Cir. 1970)), that contention in no way compels any different conclusions than those expressed in this opinion. The underlying philosophy of Section 552 favors disclosure. *See* Senate Report at 3. Section 552(c) provides that Section 552 "does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section." *See* the decision *supra* at pp. 7–8 re Wellford v. Hardin, *supra*. The thrust of Section 552(c) is that exceptions from the disclosure provisions of Section 552 are to be carefully construed. *See* House Report at 11; Senate Report at 10. To place the burden of proof on the plaintiff to prove the

any other governmental agency can shoulder that burden by simply stating as a matter of fact that it has so done, or by simply labelling as investigatory a file which it neither intends to use, nor contemplates making use of, in the future for law enforcement purposes, at least not without establishing the nature of some harm which is likely to result from public disclosure of the file. Something more than mere edict or labelling is required if the Freedom of Information Act is to accomplish its "primary purpose, i. e., 'to increase the citizen's access to government records.' " [10]

The above was, of course, written in the context of the facts of this case. In most cases perhaps, the Government may satisfy its burden of proof simply by establishing that the information sought was compiled for investigatory purposes and rests in an investigatory file, none of the contents of which have ever been made public. But that is not the case here.

I continue to agree with Judge Kaufman that the purpose of the Act should not be defeated if there is available a judicial technique for advancing it and at the same time ensuring that no harm comes to the interests Congress intended to protect. *In camera* inspection, as required by the remand order of the withdrawn opinion, is such a technique. The fact that, in *Mink*, the Supreme Court determined that the language and legislative history of the Section (b)(1) exemption did not permit the use of *in camera* inspection does not mean that the technique is unsuitable in every case involving the Section (b)(7) exemption.[11] Indeed, its use seems most suitable in this case. Without it, the public will have to rely entirely upon the Justice Department's opinion that "[t]he results of the spectrographic tests are *adequately* shown in the report of the Warren Commission. . . ." [12] I suggest that Congress, in enacting the Freedom of Information Act did not intend that the public would so have to rely.

---

nonapplicability of a Section 552(b) exception when the Government as a rule has knowledge of nearly all the facts relevant to such an exception would be contrary to the disclosure philosophy of all of Section 552 and specifically of Section 552(c). Moreover, placing the burden of proof on the plaintiff would also seemingly run contrary to the underlying philosophy set forth in the House Report which, in explaining why the burden of proof was placed on the agency to justify the withholding of information in Section 552(a)(3), stated (at 9): "A private citizen cannot be asked to prove that an agency has withheld information improperly because he will not know the reasons for the agency action." *See also* Senate Report at 8. That same reasoning would seem equally applicable in determining the relationship among 552(a)(3), 552(b)(7) and 552(c).

\* \* \* \* \*

10. Getman v. N. L. R. B., 450 F.2d *supra* at 672, in which Judge Wright quoted from Judge Bazelon's opinion in *Bristol-Myers. See* Philadelphia Newspapers, Inc. v. Department of H. & U. D., 343 F.Supp. 1176, 1180 (E.D.Pa.1972); Cowles Communications, Inc. v. Department of Justice, *supra*, 325 F.Supp. at 727.

"For the great majority of different records, the public as a whole has a right to know *what its Government is doing*" (emphasis supplied), Senate Report at 5-6. And *see also* the "conclusion" in House Report at 12: "A democratic society requires an informed, intelligent electorate, and the intelligence of the electorate varies as the quantity and quality of its information varies. A danger signal to our democratic society in the United States is the fact that such a political truism needs repeating. \* \* \*"

11. As Judge Kaufman observed in note 8 of the withdrawn opinion,
[I]n this case no Executive order, and no matter of national defense or foreign policy, is asserted to be involved. Further, it is to be noted that in remanding in connection with the application of 5 U.S.C. § 552(b)(5) exempting "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency", Mr. Justice White in the *Environmental Protection Agency* case placed the burden of showing entitlement to the (b)(5) exemption upon the Government.

12. Emphasis supplied.

Accordingly, I dissent, and continue to adhere to the views on this issue expressed by Judge Kaufman in his majority opinion for the panel.