Howard S. ABRAMSON, Appellant,

v.

FEDERAL BUREAU OF
INVESTIGATION, et al.

No. 79–2500.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 1980.

Decided Oct. 24, 1980.

Sharon T. Nelson, Washington, D. C., for appellant.

Howard S. Scher, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellees.

Before WRIGHT, Chief Judge, and MIKVA and EDWARDS, Circuit Judges.

Opinion for the court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This appeal raises an issue concerning the obligation of the Federal Bureau of Investigation (FBI) to furnish information pursuant to a citizen request made under the Freedom of Information Act (FOIA).[1] During the period from 1969 through 1974, during the incumbency of former President Nixon, the FBI transmitted documents pertaining to various public personalities to the White House; these documents were compiled by the FBI in response to requests received from the White House. Petitioner, Howard S. Abramson, initially sought to obtain these documents through a request for information, under the FOIA, which was submitted to the FBI in June of 1976. After several attempts to secure the documents from the FBI proved unsuccessful, Petitioner filed suit on December 20, 1977 in the United States District Court for the District of Columbia to compel disclosure.

During the pendency of the suit in District Court, the FBI reprocessed Abramson's request and provided him with a portion of the materials sought. However, in response to the request for the remaining unreleased documents, the FBI asserted three statutory exemptions from the disclosure requirements of the FOIA. In particular, the FBI claimed that the disputed documents were protected from disclosure under Exemptions (b)(1),[2] (b)(7)(C),[3] and (b)(7)(D).[4]

---

1. 5 U.S.C. § 552 (1976).

2. 5 U.S.C. § 552(b)(1). Exemption 1 authorizes withholding of documents that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."

3. 5 U.S.C. § 552(b)(7)(C). Exemption (7)(C) authorizes withholding of documents that are "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... con-

stitute an unwarranted invasion of personal privacy...."

4. 5 U.S.C. § 552(b)(7)(D). Exemption (7)(D) authorizes withholding of documents that are "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source...."

Following several hearings before the District Court, the issues narrowed; as a consequence, the sole question remaining for resolution on this appeal is the applicability of a claimed exemption under section (b)(7)(C).[5] The documents here in question include one letter, with attachments, *see* note 12, *infra*, referred to as "name check" responses. These "name checks" are summaries of information from FBI files on certain public personalities which had been prepared pursuant to requests received from the White House. The District Court found that "there has been absolutely no showing that these particular records were compiled for law enforcement purposes," and ruled that, since "the defendants have failed to meet their burden . . . summary judgment will be granted in favor of the plaintiff on this point."[6] However, the District Court also found that the disputed documents were "exempt from disclosure pursuant to exemption (7)(C) because disclosure would constitute an unwarranted invasion of personal privacy."[7] Petitioner challenges this latter ruling denying disclosure of the requested documents.

Upon a careful review of the record in this case, we find that the District Court misapplied the law with respect to the applicability of Exemption (7)(C) to the "name check" summaries. We therefore reverse on this point, with an instruction that the summaries be released to Petitioner. With regard to the materials attached to the "name check" summaries, we remand for further proceedings for a determination by the District Court as to whether the attachments were "compiled for law enforcement purposes" and, if so, whether these documents are thus exempt from disclosure under section (7)(C).

## I. BACKGROUND

Petitioner, a professional journalist, has stated that "[t]he requests which are the subject of this lawsuit grow directly out of [his] interest in the extent to which the White House may have used the F.B.I. and its files to obtain derogatory information about political opponents and those that it perceived as enemies." App. at 11.

Petitioner first filed his FOIA request on June 23, 1976, App. 5, in a letter to Clarence M. Kelley, then the Director of the FBI. Petitioner's request sought the following documents:

—Copies of any and all information contained in your agency's files showing or indicating the transmittal of any documents or information from the FBI to the White House, or any White House aides, for the years 1969 and 1970, concerning the following individuals: Lowell P. Weicker, Jr.; Thomas J. Meskill; Joseph Duffey; Thomas J. Dodd; Alphonsus J. Donahue; John Lupton; Wallace C. Barnes; and Emilio Q. Daddario;

—Copies of any and all information so transmitted.

—An uncensored copy of the Oct. 6, 1969, letter from J. Edgar Hoover to John D. Ehrlichman by which Mr. Hoover transmits "memoranda" on several individuals to Mr. Ehrlichman.

—A copy of the original request letter from Mr. Ehrlichman to Mr. Hoover for that data.

—Copies of all data so transmitted by the Oct. 6, 1969, letter from Mr. Hoover to Mr. Ehrlichman.

—A copy of the receipt signed by the recipient at the White House of the Oct. 6, 1969, letter.

App. at 5.

By letter dated July 23, 1976, Kelley notified Petitioner that the Bureau would not search its files to determine whether it had the requested information until Petitioner obtained notarized authorization for the disclosure of the information from the subjects

---

5. Petitioner no longer challenges the FBI's claimed exemptions under § (b)(1) and § (7)(D). Petitioner's brief at 10.

6. Petitioner's appendix (App.) at 73. These rulings appeared in an Order of the District Court

which was issued on November 30, 1979. App. at 72–73.

7. App. at 73.

of the request. App. at 7. Kelley indicated that, without such authorization, the information would be "exempt from disclosure pursuant to Title 5, United States Code, Section 552(b)(6), which exempts information the disclosure of which would constitute a clearly unwarranted invasion of personal privacy and/or (b)(7)(C), which exempts information the disclosure of which would constitute an unwarranted invasion of personal privacy." App. at 7.[8]

After receiving Kelley's response, Petitioner assumed that his initial "request was too specific and that in its specificity it violated the privacy of others." App. at 12–13. Petitioner thereafter filed a new request on August 3, 1976, seeking the following documents:

1. All written requests and written records of oral or telephone requests from the White House or any person employed by the White House to the FBI for information about any person who was in 1969, 1970, 1971, 1972, 1973, or 1974 the holder of a federal elective office or a candidate for federal elective office.

2. All written replies and records of oral or telephonic replies from the FBI to the White House in response to requests described in paragraph one.

3. Any index or indices to requests or replies described in paragraphs one and two.

App. at 9. On August 20, 1976, Kelley denied Abramson's second request for failure to "reasonably describe the records sought" as required by 28 C.F.R. § 16.3(b) (1979).[9]

After unsuccessfully appealing both denials within the agency, Abramson filed suit, on December 20, 1977, in the United States District Court for the District of Columbia to enjoin the FBI from withholding the records and to make the records immediately available to him. The FBI responded to Abramson's suit by denying all liability under the FOIA, as it had done throughout the administrative appeals. During the pendency of this action, the FBI reprocessed Abramson's requests and provided him with eighty-four pages of documents—some intact, and some with deletions. The Government claimed that the deleted material was protected from disclosure under Exemptions (b)(1), (b)(7)(C) and (b)(7)(D).[10]

On the Government's motion for dismissal or, alternatively, summary judgment, the District Court issued an order on January 3, 1979, requiring the Government to allow Petitioner to modify his second request to more reasonably describe the documents sought, and requiring the Government to re-evaluate the nondisclosed material claimed exempted under (b)(1) in light of Executive Order 12065, 43 Fed.Reg. 28,949 (1978).[11] App. at 18, 20. In addition, the District Court denied the Government's motion with respect to Exemptions (7)(C) and (7)(D), pending a showing that the documents for which the exemptions were claimed were compiled for law enforcement and not political purposes. App. at 18–19. The District Court noted that the only evidence before it to indicate that the records were compiled for law enforcement purposes was the Government's assertion that:

8. The FBI no longer asserts Exemption (b)(6), 5 U.S.C. § 552(b)(6), as a justification for nondisclosure. This exemption protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

9. The reference to 28 C.F.R. § 16.3(b) appears in the Department of Justice's regulations pertaining to Production or Disclosure of Material or Information under the FOIA. 28 C.F.R. § 16.1 (1979). 28 C.F.R. § 16.3(b) provides that:

(b) *Request should reasonably describe the records sought.* A request for access to records should sufficiently identify the records

requested to enable Department personnel to locate them with a reasonable amount of effort. Where possible, specific information regarding dates, titles, file designations, and other information which may help identify the records should be supplied by the requester. If the request relates to a matter in pending litigation, the court and its location should be identified.

10. *See* notes 2, 3 and 4, *supra.*

11. Executive Order 12065 superceded Executive Order 11652, as amended, 50 U.S.C. § 401 (1978), on December 1, 1978.

The documents which are at issue in this proceeding were compiled by the FBI pursuant to requests by the White House and were transmitted by the Bureau to a senior White House official, John D. Ehrlichman. Thus, the records plaintiff seeks were compiled pursuant to the investigative authority of the FBI.

App. at 18.

In its January 3, 1979 Memorandum Opinion and Order, the District Court cited *Weisberg v. United States Department of Justice*, 489 F.2d 1195, 1202 (D.C.Cir.1973) (en banc), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974), which held that, notwithstanding the Attorney General's designation of certain investigatory files as having been compiled for law enforcement purposes, "his *ipse dixit* does not finalize the matter, for there remains the judicial function of determining whether that classification be proper." App. at 19. The District Court Memorandum Opinion also noted that:

> The Court does not full understand the government's logic that because the records were compiled at the White House's request, they are "thus" investigatory. Moreover, this contention does not even address the issue whether the records were compiled for "law enforcement" rather than political purposes.

App. at 19. The District Court thus found the bald assertion of exemption by the FBI to be an insufficient basis from which to determine the proper classification of the documents. *Id.*

On September 6, 1979, the FBI submitted an affidavit to the District Court describing in detail the four documents that were processed in response to Petitioner's request, and an explanation in each instance of the justifications for nondisclosure.[12] On the basis of this affidavit, and the eighty-four pages of documents that the FBI had previously released, Petitioner submitted a modified request on September 25, 1979, seeking only the material withheld from "Document No. 3." App. 47. Document No. 3 includes a one-page memorandum, dated October 6, 1969, from J. Edgar Hoover to John D. Ehrlichman, plus approximately sixty-three pages of "name check" summaries and attachments. The "name check" summaries detail information, culled from FBI files, on eleven public personalities.[13]

On November 30, 1979, the District Court ruled on the parties' cross-motions for summary judgment with respect to the material withheld from Document No. 3. Finding once again that the FBI had failed to show that the information was compiled for law

12. The affidavit describes the four documents as follows:

A. An October 6, 1969, letter from J. Edgar Hoover to John D. Ehrlichman, marked with file number 62–5–34727, with enclosures, regarding FBI name checks on William J. Harris, J. Keith Mann, Dr. Karl Augustus Menninger, Howard Pyle and Wilbur Hughes Strickland, M.D. Also accompanying the document is a list of names reflecting the name check request from the White House. [Document No. 1].

B. An October 6, 1969, letter from J. Edgar Hoover to John D. Ehrlichman, marked with file number 65–5–34728, with an enclosure relating to an FBI name check on Archie Floyd Weaver. Also accompanying the document is a letter dated October 2, 1969, reflecting the name check request from the White House. [Document No. 2].

C. An October 6, 1969, letter from J. Edgar Hoover to John D. Ehrlichman, marked with file number 65–5–34736, with enclosures relating to FBI name checks on Cesar Estrada Chavez, Joseph Duffey, Maurice Eisendrath, John Kenneth Galbraith, Richard N. Goodwin, Fannie Lou Hamer, Dr. Reinhold Nieburh, Paul Schrade, Adam Walinsky and Dr. George Wiley. Also among the enclosures is a copy of an article written by John Kenneth Galbraith, a Vietnam Moratorium Committee Flyer, and a typed list containing the names of certain individuals whose names appeared on the flyer. [Document No. 3].

D. An October 6, 1969, letter from J. Edgar Hoover to John D. Ehrlichman, marked with file number 62–5–34747, with enclosures relating to FBI name checks on George W. Barton and C. Monroe Shigley. Also accompanying the document is a letter dated October 3, 1969, reflecting the name check request from the White House. [Document No. 4].

Affidavit of Special Agent Jerry R. Donahoe. App. at 21, 25–26.

13. See names listed in paragraph "C," note 12, *supra.*

enforcement rather than political purposes, the District Court ruled that:

> The document at issue concerns information requested by and transmitted to the Nixon White House concerning eleven individuals. Each of these eleven individuals has been prominently associated with liberal causes and/or has been outspoken in their opposition to the war in Indochina that was being waged by this nation at that time.
>
> The defendants contend that the White House "name check" requests qualify as records compiled for law enforcement purposes because the White House has special security and appointment functions. At no point in their pleadings do the defendants relate these broad and general duties to the individuals about whom information was requested from the FBI. Thus, there has been absolutely no showing that these particular records were compiled for law enforcement purposes. Accordingly, the defendants have failed to meet their burden, and summary judgment will be granted in favor of the plaintiff on this point.

App. at 72–73. However, the District Court then went on to rule that Exemption (7)(C) was validly invoked by the Government because disclosure of the withheld materials would constitute an unwarranted invasion of personal privacy. The District Court thus granted the Government's motion for summary judgment "with respect to material withheld pursuant to Exemption ... (7)(C)." *Id.*[14]

## II. APPLICABILITY OF EXEMPTION (7)(C) TO THE "NAME CHECK" SUMMARIES

The primary issue presented here for our review is whether the District Court erred in upholding the nondisclosure of certain documents pursuant to Exemption (7)(C), when it found that the Government had failed to carry its burden of proof in demonstrating that the withheld documents were compiled for law enforcement purposes.

Petitioner argues that the District Court's ruling on the application of Exemption (7)(C) was plainly erroneous because the FOIA clearly prohibits the withholding of documents under Exemption (7)(C) unless the documents are found to have been compiled for "law enforcement purposes."

The Government argues that the District Court correctly concluded that Exemption (7)(C) was properly invoked to justify the withholding of the documents, notwithstanding its finding that the FBI's compilation of the "name check" summaries was not done for law enforcement purposes. On this point, the Government contends that Exemption (7)(C) is applicable because the "name check" summaries were based on information contained in documents in FBI files that were originally created for law enforcement purposes. As part of its proof on this point, the Government submitted the affidavit of Special Agent Donahoe; this affidavit indicated that each individual segment of information withheld had been traced in order to verify the specific character of each segment as investigatory material obtained by the FBI in connection with a specific law enforcement purpose. App. at 29. In effect, the Government argues that the District Court's conclusion that the Government had failed to demonstrate that the "name check" responses were compiled for law enforcement purposes is not fatal to its claim of exemption under section (b)(7)(C).

The threshold inquiry regarding any document for which a section (b)(7)(C) exemption is claimed is whether such document has been shown to be an investigatory record, which was "compiled for law enforcement purposes." In the Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act, published in February of 1975 as a guideline

---

**14.** The District Court also granted the Government's motion for summary judgment with respect to Exemption 1, finding that the Government had properly classified certain deleted material under the national security exemption. Petitioner does not challenge this portion of the District Court order on this appeal.

for the implementation of the Act, a three-pronged test is set out for determining the applicability of section (b)(7)(C) to documents:

> Once it is determined that [the threshold requirements of] "investigatory record" [and] "compiled for law enforcement purposes" [have been met], *the next* question is whether release of the material would involve one of the six types of harm specified in clauses (A) through (F) of amended exemption 7.[15]

A simple reading of the applicable provisions of the FOIA plainly supports this interpretative memorandum by the Attorney General. Thus, it is axiomatic that any consideration of whether disclosure would constitute an "unwarranted invasion of personal privacy" is premature until the documents in issue have been shown by the Government to be investigatory records which were compiled for law enforcement purposes.

█ Moreover, the Government agency bears the *full burden of proof* in establishing that the requirements of an exemption have been met before it can withhold a requested document from disclosure. *Jordan v. United States Department of Justice*, 591 F.2d 753, 779 (D.C.Cir.1978) (en banc). *See also Exxon Corp. v. Federal Trade Commission*, No. 79–1995, slip op. at 11 (D.C.Cir. Oct. 3, 1980). The District Court, having properly concluded that the Government failed to sustain its burden of demonstrating that the documents were compiled for law enforcement purposes, erroneously extended its analysis in finding that disclosure would constitute an unwarranted invasion of personal privacy. These two rulings, when taken together, are inconsistent with the plain mandate of the FOIA. We hold that the "name check" summaries, which the District Court found were compiled solely for use by the White House for purposes having nothing whatsoever to do with "law enforcement," were improperly withheld under the FOIA.

15. The Attorney General's Memorandum is cited at pp. 15–16 in petitioner's brief. *See also*

## III. THE DISTINCTION BETWEEN "DOCUMENTS" AND "INFORMATION"

Although the Government acknowledged that the "name check" summaries were not compiled for law enforcement purposes, the claim is made that nondisclosure was justified because

> [a]ll of the *information* withheld was *originally* obtained and compiled by the FBI in connection with either a background investigation of an individual being considered for an official appointment or else an investigation into a suspected violation of law.

Appellee's brief at 9 (emphasis added). In other words, the Government asserts, and Petitioner does not directly dispute, that the *information* used to compile the "name check" summaries came from FBI documents that were compiled for legitimate "law enforcement purposes."

Even if we accept the truth of the Government's assertion, we are still left with undisputed facts indicating that: (1) the "name check" summaries were originally developed pursuant to a request from the White House for information about certain public personalities; (2) the "name check" summaries were not duplicates of any FBI investigatory documents that were compiled for legitimate law enforcement purposes; and (3) the documents constituting the "name check" summaries were not compiled for any legitimate law enforcement purposes.

Without passing on whether the original FBI files were compiled for legitimate law enforcement purposes, the District Court properly distinguished between the "name check" summaries and the original FBI files. It is the nondisclosure of only the "name check" summaries that is in issue in this case. It is with respect to these documents that the District Court found that the Government had failed to show a legitimate law enforcement purpose. The Government on appeal attempts to gloss

*Lesar v. United States Dep't of Justice*, 636 F.2d 472 at 486–488 (D.C.Cir.1980).

over the distinction between the two sets of documents by characterizing the recompiled summaries as simply extensions of the original documents from which they derive, all bearing the same information.

■ However, the statutory scheme of the FOIA very clearly indicates that exemptions from disclosure apply only to *documents*, and not to the use of the information contained in such documents.[16] Thus, when information has been recompiled in a new document for a new purpose, the new document must qualify independently for any exemptions from disclosure under the FOIA.

■ While the Government does indeed concede that the White House "name check" requests resulted in the production of documents which were distinct from the underlying documents already contained in the FBI files, it did not introduce any evidence to demonstrate that the responses to the White House requests were compiled for law enforcement purposes. App. at 28. Rather, the Government simply relies on its assertion that the *underlying documents* were compiled for law enforcement purposes to meet the threshold requirements of the (b)(7)(C) exemption for the "name check" summaries.

A similar argument was recently considered and rejected by this court in *Lesar v. United States Department of Justice*, 636 F.2d 472 (D.C.Cir.1980). In *Lesar*, petitioner sought the disclosure of deletions from reports released to him that had been prepared by the Civil Rights Division and a special Task Force in the Department of Justice with respect to various FBI surveillances of Dr. Martin Luther King. The Justice Department excised certain materials, pursuant to section (b)(7)(C), which con-

sisted of "the names and other identifying information of persons involved in the King investigation, including informants and lower-level FBI personnel, as well as information of a personal nature, the disclosure of which allegedly could embarrass Dr. King's family and associates or damage their reputations." [17]

Lesar challenged the applicability of the exemption to the withheld material on the ground that the material was not "compiled for law enforcement purposes." Lesar argued that because the FBI's surveillance had degenerated into a campaign "to discredit and to neutralize Dr. King," [18] and was unrelated to any legitimate law enforcement purpose, it did not meet the threshold requirements set forth in section 7. In rejecting Lesar's argument, this court distinguished the underlying original surveillance records, about which it entertained "serious doubts whether [they] could be construed in their entirety as 'investigatory records compiled for law enforcement purposes,' " [19] from the Justice Department's Task Force summaries, which were at issue in the *Lesar* case. The court then noted that there was no dispute as to whether the Task Force materials were compiled during the course of a legitimate law enforcement investigation—that, in fact, one of the purposes for which the Task Force had been created was to investigate alleged improprieties in the FBI surveillances of Dr. King. The court concluded that "[w]e thus resist appellant's suggestion that we somehow should 'pass through' the Task Force notes to the underlying FBI surveillance records and inquire further into the point at which the FBI's investigation of Dr. King strayed beyond its lawful scope. We hold that the documents at issue

---

16. *See Simpson v. Vance*, 648 F.2d 10 at 16–17 (D.C.Cir.1980) (State Department Biographic Register not exempt, even though information in Register was extracted from personnel files which may have been exempt under section (b)(6)).

17. *Lesar v. United States Dep't of Justice*, 636 F.2d 472 at 486 (D.C.Cir.1980).

18. *Id.* at 3 (quoting from the *Murphy Report*, Memorandum from Robert A. Murphy, Chief of the Criminal Section of the Civil Rights Division, to J. Stanley Pottinger, Assistant Attorney General, Civil Rights Division of the Department of Justice (March 31, 1976), at 138).

19. *Id.* at 27.

meet the threshold requirement of subsection 7." [20]

In *Lesar* the petitioner attempted to impute the illegitimate purposes associated with the compilation of the underlying documents to the Task Force summaries that were derived from the underlying documents; in this case the Government seeks to impute the legitimate purposes associated with the compilation of the underlying FBI files to the "name check" summaries that were prepared for the White House. Although this case is the reverse of *Lesar*, we are constrained here, as we were in *Lesar*, to reject the "pass through" theory. Each *document* for which a section (b)(7)(C) exemption is claimed under the FOIA must first be shown to be an "investigatory record compiled for law enforcement purposes."

We agree with the District Court that the Government has failed to demonstrate that the "name check" summaries were compiled for law enforcement purposes, and accordingly find that the recompiled summary documents have been improperly withheld.

## IV. APPLICABILITY OF EXEMPTION (7)(C) TO THE "ATTACHMENTS" TO THE "NAME CHECK" SUMMARIES

There is an additional issue in this case, which, although given only cursory treatment by the parties, warrants discussion. As noted above, Document No. 3, the focus of this litigation, is composed of a one-page letter from the FBI to John Ehrlichman. Enclosed with the letter are sixty-three pages of "name check" summary memoranda *and attachments* pertaining to ten of the eleven individuals. While Petitioner argues that *none* of the FBI's responses were prepared pursuant to legitimate law enforcement purposes, and the Government argues that even if the summaries themselves have not been shown to have been compiled for law enforcement purposes, the underlying documents from which they were compiled were clearly the product of legitimate law enforcement investigations, neither party

has suggested that the two types of documents comprising Document No. 3—summaries and attachments—might be treated differently under our section (b)(7)(C) analysis. Nor did the District Court consider the summaries and attachments separately for section (b)(7)(C) purposes when it ruled that the threshold requirements for the exemption had not been met.

In *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1974),[21] the Supreme Court considered a case in which documents that are arguably exempt from disclosure under FOIA are incorporated into a non-exempt document. The non-exempt documents in the *Sears* case were Advice and Appeals Memoranda prepared by the General Counsel of the National Labor Relations Board. The incorporated documents were memoranda prepared in contemplation of the litigation, and thus were exempted as "intra-agency" memoranda under section (b)(5) of the FOIA. In holding that the exempt memoranda lost their exemption in the incorporation process, the Court suggested that the character of the memoranda had been transformed from intra-agency memoranda in contemplation of upcoming litigation to memoranda explaining a final agency action. That is, the nature of the document itself was changed with the different use to which the information contained in the document was put:

> Petitioners assert that the District Court erred in holding that documents incorporated by reference in non-exempt Advice and Appeals Memoranda lose any exemption they might previously have held as "intra-agency" memoranda. We disagree.
>
> The probability that an agency employee will be inhibited from freely advising a decisionmaker for fear that his advice, *if adopted*, will become public is slight. First, when adopted, the reasoning becomes that of the agency and becomes *its* responsibility to defend.... Moreover,

---

**20.** *Id.* at 28–29.

**21.** *See also Renegotiation Bd. v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1974).

[there is] the public interest in knowing the reasons for a policy actually adopted by an agency.... Thus, we hold that, if an agency chooses *expressly* to adopt or incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5.

*Id.* at 161, 95 S.Ct. at 1521. Thus, the previously exempt predecisional documents may lose their predecisional character and become new and different post-decisional documents by their incorporation into a final agency opinion. *See Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 867 (D.C.Cir.1980); *Bristol-Myers v. Federal Trade Commission*, 598 F.2d 18, 24–29 (D.C.Cir.1978); *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967 (7th Cir. 1977).

■ Yet, it does not follow that the "attachment" documents in the instant case, which may have been originally exempt under section 7, lost their exempt status when they were attached to the "name check" summaries. While the use to which the information contained in records exempt under section (b)(7) may change, the nature of the document itself does not. The Court in *NLRB v. Sears, Roebuck* recognized this difference, and held that documents exempt under section (b)(7) do not lose their exemption in the incorporation process once the exemption has attached:

Finally, the General Counsel claims that the documents, incorporated by reference in Advice and Appeals Memoranda, which were previously protected by Exemption 7, should not lose their exempt status by reason of incorporation.... [W]e think the argument is sound. The reasons underlying Congress' decision to protect 'investigatory files' ... are as applicable to a document referred to in an Advice or Appeals Memorandum as they are to a

document which is not. Therefore, a document protected by Exemption 7 does not become disclosable solely because it is referred to in a 'final opinion.'

*Id.* at 165–66, 95 S.Ct. at 1524. Moreover, we believe that even if all of the information contained in a document that is exempt under section (b)(7) becomes released through some other communication, the document itself could retain its exemption.

■ While we are satisfied that the "name check" summaries were not compiled for legitimate law enforcement purposes, we are less sure of the "attachments." We are unable to determine from the evidence in this case the precise nature of the "attachments" or the purposes for which they were originally created. If it is found that the "attachment" documents were already in existence and a part of the FBI files prior to the White House's "name check" requests, and that these original documents were sent to the White House as initially compiled and without any modification, then a determination would have to be made as to whether these documents meet the threshold requirements of section (b)(7).

Accordingly, we remand to the District Court for a finding on the issue of whether the "attachments" that were sent to the White House in response to its requests for "name checks" were the *original documents* from the FBI files compiled prior to the White House requests, and whether they were originally compiled pursuant to a legitimate law enforcement investigation.[22] Should the District Court on remand find that the "attachment" documents are in fact investigatory records which were compiled for law enforcement purposes, then a determination must be made as to whether the attachments are exempt from disclosure under section (b)(7)(C).

On remand, it may be appropriate for the District Court to "examine the contents of [the attachments] *in camera* to determine whether such records or any part thereof

---

**22.** *See Rural Housing Alliance v. United States Dep't of Agriculture*, 498 F.2d 73, 80, 82 (D.C. Cir.1974).

**816**

shall be withheld" under section (b)(7)(C).[23] Such *in camera* inspection should serve to avoid any further disputes or delays in this litigation.

## V. CONCLUSION

The judgment of the District Court is reversed as to the FBI "name check" summaries. The District Court is hereby instructed to require appellee to release all of the "name check" summaries heretofore withheld pursuant to a claimed exemption under section (b)(7)(C) of the FOIA.

As to the "attachment" documents, the case is remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*

---

**23.** *See* 5 U.S.C. § 552(a)(4)(B), allowing for *in camera* inspection under the FOIA.