**Stephen GOLDSCHMIDT, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Defendant.**

Civ. A. No. 82–2946.

United States District Court, District of Columbia.

Feb. 4, 1983.

Eric R. Glitzenstein, Katherine A. Meyer, Alan B. Morrison, Washington, D.C., for plaintiff.

Rebecca L. Ross, Asst. U.S. Atty., Washington, D.C., for defendant.

MEMORANDUM

GESELL, District Judge.

The Food Safety and Inspection Service (FSIS) of the United States Department of

Agriculture prepares Inspection Location Reports (ILRs) listing conditions in meat or poultry plants which an inspector believes to be in violation of applicable laws and regulations. The sole issue in this Freedom of Information Act (FOIA) case is whether these reports are "investigatory records compiled for law enforcement purposes," production of which would "interfere with enforcement proceedings" within the meaning of FOIA exemption 7(A). 5 U.S.C. § 552(b)(7)(A). The case is before this Court on cross-motions for summary judgment. No material fact is in dispute, and summary judgment must be granted plaintiff as a matter of law.

Meat and poultry establishments are subject to continuous inspection by USDA inspectors physically present in the plant. In addition to such inspection, FSIS has a Review and Evaluation Staff which conducts independent on-site reviews at plants to evaluate the effectiveness of the USDA's continuous inspection program. When the Staff reviewer notes conditions at an establishment that are in violation of applicable meat and poultry laws and regulations, an ILR is prepared. The ILR is simply a list of the conditions believed to constitute violations of meat and poultry regulations.

Prior to May of 1982, the FSIS Review Staff routinely wrote up ILRs for every establishment reviewed irrespective of whether any serious violations of regulations were found. The ILR contained a list of all deficiencies noted by the reviewer, no matter how minor. It was also the FSIS's practice to release ILRs pursuant to FOIA requests before any negotiated or voluntary corrective action was undertaken. Consequently, the reports could have been "read to imply serious health hazards where none existed," and their "early release tended to compel industry members to refuse to [quickly correct the deficiencies], because to do so would appear to reflect an admission that the reports were correct." Affidavit of George B. Watts, filed with defendant's motion for summary judgment of January 13, 1983, at pp. 3, 4.

In May, 1982, that policy was changed. Instead of preparing an ILR for each establishment reviewed, FSIS Review Staff prepared circuit reports which summarized general conditions in an FSIS circuit. However, if the reviewer noted conditions in a particular plant that posed a "serious" violation of regulations, an individual ILR would also be prepared and attached to the circuit summary report. Of 562 establishments reviewed by FSIS Staff between May and September, 1982, only 16 warranted issuance of an ILR under the new policy.

When an ILR is now prepared, it is forwarded to the Meat and Poultry Inspection Operation (MPIO) component of the FSIS for further investigation into the causes of the alleged violations. If the MPIO determines that the plant is indeed responsible for violations listed in the ILR, FSIS undertakes through informal negotiation with the establishment to correct the conditions and ensure compliance with applicable regulations. If this informal effort is unsuccessful, FSIS has authority to invoke formal enforcement mechanisms including withdrawal of government inspection services (effectively closing the plant) and referral to the Department of Justice of possible criminal violations. However, formal procedures are rarely invoked and FSIS relies primarily on informal, voluntary negotiations to ensure compliance. Formal proceedings cannot be initiated without careful review within the Department.

Plaintiff Steven Goldschmidt is a journalist for *Food Chemical News,* which reports on issues involving the meat and poultry industry. On July 6, 1982, Goldschmidt requested from USDA under FOIA all ILRs prepared during May, 1982. Those documents were denied by FSIS by letter of August 10 on the grounds they were exempt from disclosure under 7(A). On October 7, 1982, plaintiff requested all ILRs prepared on the basis of reviews conducted between June and September, 1982. That request was similarly denied by letter of November 2. The FSIS eventually released to plaintiff all the documents requested, but only after completion of informal negotiations with the establishment involved and

correction of the conditions listed in the ILRs.[1] Thus, the only question remaining at issue is whether FSIS is justified under 7(A) in withholding ILRs for that period, ranging from several weeks to several months, during which investigation and informal enforcement actions are completed.

■ In order for a record to be exempt from disclosure under FOIA exemption 7(A), it must be an investigatory record compiled for law enforcement purposes, and production of that type of record must interfere with law enforcement proceedings. The Department has failed to show that the ILRs meet either of those threshold requirements.

The ILRs are not "investigatory" records compiled as part of an inquiry into specific suspected violations of the law. *Center for National Policy Review on Race and Urban Issues v. Weinberger,* 502 F.2d 370, 373 (D.C.Cir.1974); *Rural Housing Alliance v. United States Department of Agriculture,* 498 F.2d 73, 81 (D.C.Cir.1974); *Gregory v. FDIC,* 470 F.Supp. 1329, 1334 (D.D.C.1979). Rather, they are more accurately described as records generated pursuant to "routine administration, surveillance or oversight of Federal programs." *Gregory, supra* at 1333–34. The Court of Appeals noted in *Center for National Policy, supra,* "[t]here is no clear distinction between investigative reports and material that, despite occasionally alerting the administrator to violations of the law, is acquired essentially as a matter of routine. What is clear, however, is that where the inquiry departs from the routine and focuses with special intensity upon a particular party, an investigation is under way." 502 F.2d at 373.

■ ILRs are compiled from information gathered during independent plant inspections by FSIS's Review and Evaluation Staff. At that point, there is no enforcement proceeding or investigation focusing on specific alleged illegal acts in existence. The Staff reviews are clearly routine administration. *See Sears, Roebuck & Co. v. GSA,* 509 F.2d 527, 528 (D.C.Cir.1974); *Rural Housing, supra* at 80–82. They are not directed at particular plants; not based on information suggesting that any specific establishment is violating regulations; and the Department admits that the primary purpose of the reviews is to evaluate the effectiveness of the USDA's continuous inspection program. Affidavit of Donald L. Houston, filed with defendant's motion for summary judgment of January 13, 1983, at p. 3. In fact, the FSIS Review and Evaluation Staff which prepares the ILRs has no enforcement functions. It is only *after* the Review Staff has forwarded the ILR to the MPIO for further information-gathering and informal negotiations that the inquiry "departs from the routine" and an investigation can be said to have started. While the information resulting from further investigation by the MPIO may be exempt from disclosure under exemption 7(A), the ILR is not exempt simply because it is commingled with that information in the MPIO file. The fact that information in an ILR may form a *basis* for further investigation does not make that ILR an investigatory record created *pursuant to* an investigation.

Nor is the status of the ILR affected by FSIS's recent change in policy that individual ILRs only be prepared when review suggests "serious" violations, rather than for every plant. The information in the ILR is still gathered during the course of routine administration and does not become investigatory because it may alert the administrator to a possible violation of law. *Center for National Policy Review, supra* at 373.

This view of the meaning of "investigatory" records is borne out by the legislative

---

1. In its motion for summary judgment, the USDA relies on this fact and argues that the case is consequently moot. That argument is spurious and this Court must reject it. Plaintiff has continued to file additional FOIA requests for ILRs and the USDA has continued to withhold those documents pending the outcome of investigation and voluntary negotiations. There is still a live controversy between the parties and this case presents a classic example of a dispute "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

history of exemption 7(A). In 1974 exemption 7 was amended and the term "investigatory records" was substituted for "investigatory files" to make clear that materials generated in the course of routine government operations could not be protected simply because they were placed in the file of a subsequently-initiated law enforcement investigation. Senator Hart, the sponsor of the 1974 amendments, noted that without the new amendment "such information as *meat inspection reports,* civil rights compliance information, and medicare nursing home reports will be considered exempt under the seventh exemption." House Committee on Government Operations and Senate Committee on the Judiciary, Freedom of Information Act and Amendments of 1974 (P.L. 93–502) Source Book, 94th Cong. 1st Sess., at 333 (Joint Committee Print 1975) (hereinafter cited as 1975 Source Book) (emphasis added). Those remarks suggest that it was never intended that "investigatory records" be interpreted so broadly as to encompass all information resulting from routine inspections.

■ Even if the ILRs qualified as investigatory records compiled for law enforcement purposes, they still would not fall under exemption 7(A) because the agency has failed to show that their disclosure would interfere with enforcement proceedings. The Department's sole argument is that, if ILRs are made public before the meat or poultry plant has had an opportunity informally to arrange to correct the alleged violations, "voluntary compliance" will be harmed in some undefinable way and the negotiation process impeded because "[p]ublicity during negotiations results in establishments denying rather than remedying deficiencies" and "forces the company involved to adopt a highly defensive posture in dealing with both the press and USDA." Defendant's memorandum in support of motion for summary judgment, filed January 13, 1983, at pp. 8, 9.

As a threshold matter, it is questionable whether the FSIS's informal, voluntary negotiation with a meat or poultry establishment qualifies as an "enforcement proceeding." More importantly, the legislative history of exemption 7 makes clear that possible interference in informal negotiations due to publicity placing a company in a "defensive" posture is *not* the sort of interference with law enforcement proceedings Congress intended would justify withholding. When 7(A) was amended in 1974, sponsoring Senator Hart explained that the exemption was intended to apply

> whenever the Government's case in court—a concrete prospective law enforcement proceeding—would be harmed by the premature release of evidence or information not in the possession of known or potential defendants. This would also apply where the agency could show that the disclosure of the information would substantially harm such proceedings by impeding any necessary investigation before the proceedings.

1975 Source Book, *supra* at 333.

Later cases in which a claim of exemption 7(A) has been considered also focus on whether release of withheld documents permits the target of an investigation to discern the scope and nature of the government's case, or to affect evidence or impede an investigation. *See NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978); *Coastal States Gas Corp. v. DOE,* 617 F.2d 854 (D.C.Cir. 1980); *Campbell v. HHS,* 682 F.2d 256 (D.C. Cir.1982). This is not such a case. No potential target of investigation or enforcement action seeks access to information not in its possession. The Department does not argue that the meat or poultry establishment is unaware of the conditions noted in the ILR, or that disclosure of the ILRs would somehow lead to alteration or destruction of evidence.

It is well established that the government must show more than a direct relationship between agency records and a pending investigation in order to demonstrate that disclosure would interfere with enforcement proceedings. *Campbell, supra* at 261. Congress never intended 7(A) to be so broad as to prohibit disclosure where, as here, publicity surrounding an establishment's vi-

olations "interferes" with enforcement by embarrassing the establishment so that it drags its heels in remedying its compliance. Such a broad application would enable an agency to withhold investigatory records in almost all cases; it is difficult to imagine a situation in which publicity surrounding an investigation might not have some detrimental effect on the target's behavior or attitude.

Finally, to prevail under 7(A) the government must show, by more than conclusory statements such as those furnished the Court, precisely how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding. *Campbell, supra* at 259. The Department's assertion in this case that publicity will interfere with enforcement by making an establishment less willing to negotiate is insufficient. The Department articulates no reason why such publicity would not make a violating establishment more, rather than less, willing to comply with regulations. Common sense suggests that the possibility of adverse publicity would be at least as likely to encourage compliance with regulations as discourage it. Nor does the Department explain why making ILRs public after informal settlement with FSIS is completed does not have a similar destructive effect on voluntary compliance. The burden is on the government to demonstrate that withheld documents fall properly within a FOIA exemption and the Department here has failed to meet that burden. *Coastal States, supra* at 861. Summary judgment must be granted the plaintiff and denied the defendant. An appropriate Order is filed herewith.