**GOULD INC., Plaintiff,**

v.

**GENERAL SERVICES ADMINISTRATION, Defendant.**

**Civ. A. No. 87–1319.**

United States District Court, District of Columbia.

June 1, 1988.

Thomas C. Papson, Washington, D.C., for plaintiff.

Wilma A. Lewis, U.S. Attorney's Office, Washington, D.C., for defendant.

*Memorandum Opinion and Order*

SPORKIN, District Judge.

■ This case comes before me on the parties' cross motions for summary judgment. Plaintiff Gould Incorporated (Gould) has brought this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to enjoin the General Services Administration (GSA) from withholding certain records. The records at issue are two post-award audit reports prepared by the GSA's Office of Inspector General (OIG) and supporting materials, including certain records obtained from Gould.

The defendant has denied plaintiff access to these records on the ground that they are exempt from disclosure pursuant to Exemption 7(A) of FOIA. According to the GSA, the records at issue are "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(A). Defendant contends that disclosure of these records "could reasonably be expected to interfere with enforcement proceedings." *Id.* § (b)(7)(A). Plaintiff takes issue with both of these contentions and advances several other arguments.

■ The central argument plaintiff advances, however, relates to defendant's assertion that the records at issue were "compiled for law enforcement purposes." According to plaintiff, "the threshold legal issue" I must resolve is:

[M]ay otherwise non-exempt contract documents originally created for routine auditing purposes be classed as "records or information compiled for law enforcement purposes" under 5 U.S.C.

§ 552(b)(7) merely because such documents are subsequently placed in an investigatory file and utilized for purposes of a law enforcement investigation. Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Summary Judgment Brief") at 2.[1] Because otherwise non-exempt documents created by a government agency *may* subsequently become eligible for Exemption 7(a) if they are thereafter "compiled for law enforcement purposes," I have resolved this "threshold legal issue" in favor of defendant GSA. The post-award audit reports at issue in this case were "compiled for law enforcement purposes."

Because the records sought in this case are now an integral part of an ongoing criminal investigation, and because their disclosure "could reasonably be expected to interfere with [those] enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), defendant is entitled to Summary Judgment.

THE FACTS

Beginning in October 1980, the DeAnza Systems, Inc. ("DeAnza") and its successor company, Gould Inc. Imaging and Graphics Division ("Gould") have had a series of GSA Multiple Award Schedule ("MAS") contracts for the purchase of image array processors. The first two contracts (GS–00S–6385 and GS–00S–41001) were for one year terms. The third contract (GS–GS–00S–45271) was in effect from July 19, 1982 to May 31, 1984. *See* Declaration of Otis R. Duvernay, Jr. ("Duvernay Declaration") at ¶ 8. Gould's fourth GSA MAS contract (GS–00F–78072)—which is the focus of this

controversy—was entered into on November 30, 1984 and was scheduled to expire on September 30, 1987.

In 1984, the OIG's Field Office of Audits in San Francisco, California,[2] conducted a pre-award audit of a pricing proposal submitted by Gould in response to a GSA solicitation for a $2.4 million MAS contract to supply instruments and laboratory equipment. According to defendant, "[t]he pre-award audit raised questions regarding the extent to which Gould had properly disclosed to GSA discounts offered to some of its other customers." Defendant's Summary Judgment Brief at 4. A copy of the pre-award audit was provided to Gould on July 10, 1984. *See* Duvernay Declaration at ¶ 4.

As a result of the findings of the pre-award audit, particularly concerns raised about certain pricing discounts, GSA delayed awarding the (fourth) contract to Gould. Subsequent explanations by Gould satisfied GSA's concerns. Accordingly, GSA awarded the fourth contract (GS–00F–78072) to Gould on November 30, 1984. *See* Duvernay Declaration at ¶ 5.

On June 26, 1984, prior to the award of contract GS–00F–78072, the Office of Audits provided the Regional Inspector General for Investigation in San Francisco with its pre-award audit findings. On February 25, 1985, the Office of Investigations advised the Office of Audits that it would not initiate an investigation of Gould at that time. It asked the Office of Audits to keep it informed if any further developments took place during the post-award audits of Gould's earlier contracts.[3]

---

**1.** Plaintiff's characterization of the audit reports at issue as having been "created for routine auditing purposes" is not a fully accurate description of the circumstances under which these reports were originally produced. *See infra.*

**2.** The GSA Office of Inspector General ("OIG") was established by the Inspector General Act of 1978, which consolidated all of the administrative agencies' then-existing auditing, investigating and law enforcement functions into new Offices of the Inspector General ("OIGs"). Pub. L. 95–452, 5 U.S.C. app. § 2 and § 9(a). The OIG is responsible for promoting economy and efficiency in agency programs and for detecting

and preventing fraud and abuse in such programs. 5 U.S.C. App. § 2. The Act divided responsibilities within the OIGs between an Assistant Inspector General for Auditing—who is responsible for auditing activities—and an Assistant Inspector for Investigations—who is charged with supervising enforcement investigations. *See* 5 U.S.C. app. § 3(d). The day to day auditing and investigative activities of the OIG are performed by field offices located in GSA's eleven regions.

**3.** According to defendants, at this time, the Office of Investigations:
   advised the Office of Audits that it would withhold any investigation of suspected irreg-

In September, 1985, the Office of Audits began a post-award audit of Gould's third contract, GS–00S–45271, which was for the supply of imaging processing systems, and which was in effect from July 19, 1982 to May 31, 1984. After preliminary work on this audit was completed, the scope of the audit was expanded to include the first year of Gould's (fourth) contract GS–00F–78072, even though this three-year contract had not yet been completed. According to defendant, initiation of a post-award audit prior to the completion of the contract is not GSA's common practice. *See* Duvernay Declaration at ¶¶ 3, 7, 10.[4] Defendant also claims that the Office of Audits—per Mr. Duvernay, the auditor chiefly responsible for the Gould matter,—kept the Office of Investigations informed about its findings during the course of its post-award audits. *See* Cavallo Declaration at ¶ 5; Duvernay Declaration at ¶ 6. These draft audit reports were substantially completed by March 20, 1986.[5]

Based on the findings in the post-award audits, it was determined that Mr. Duvernay's pencil draft audit reports would not be reduced to final draft reports for review by the contracting officer and contractor.[6] Instead, they were converted into two final audit reports dated October 29 and 31, 1986, and were transmitted directly to the Inspector General's Field Office of Investigations at that time.[7]

The audit reports submitted to the OIG's Office of Investigations by Duvernay are the subject of a current investigation being conducted jointly by the Office of Investigations and the United States Attorney's Office in San Francisco.[8] The records collected and generated by the Office of Audits during its post-award audit are now an integral part of this investigative effort. *See* Cavallo Declaration at ¶ 6.

This all occurred prior to Gould's filing of its January 15, 1987, FOIA request with GSA seeking among other things, "all audit reports from audits conducted by the GSA of [Gould] or Deanza Systems, Inc., and all supporting documents thereto; all [Gould] documents held by or otherwise in the possession of GSA; and all indices, catalogs, descriptions, or other lists of documents relating to all GSA audits of [Gould]." [9] On February 5, 1987, Defendant denied plaintiff access to the requested materials on the ground that they were exempt from disclosure pursuant to Exemption 7(A) of

ularities pending a review of the results of a post-award audit of Gould's earlier contract. The Regional Inspector General for Investigation requested that he be kept advised of developments during the post-award audit so that a joint determination could be made regarding further investigative action by that Office. Defendant's Statement of Material Facts as to Which There is No Genuine Issue at ¶ 4; *see also* Duvernay Declaration at ¶ 6 and Attachment 4 thereto; Declaration of Vincent G. Cavallo, Jr. ("Cavallo Declaration") at ¶ 4. Defendant contends that such a cooperative arrangement had the effect of making the records generated by the Office of Audits eligible for coverage under Exemption 7(A). *See infra.*

4. Defendant contends that the expansion of the post-award audit to include Gould's fourth contract occurred "[b]ecause the preliminary audit work on [the third] contract started to confirm suspicions about Gould's pricing practices that were raised in the pre-award audit of [the fourth] contract GS–00F–78072." Although plaintiff concedes that the post-award audit was expanded to include the fourth contract, it asserts that it is entitled to discovery pursuant to Rule 56(f) to contest defendant's explanation for

that expansion. Plaintiff also contests defendant's claim that "[u]nder normal circumstances, a post-award audit is not initiated until after a contract is completed." *See generally* Plaintiff's Counter Statement of Facts as to Which There is a Genuine Issue at ¶ 5. Defendant also seeks discovery regarding that claim.

5. Plaintiff's Counter Statement of Facts as to Which There is a Genuine Issue ("Plaintiff's Counter Statement") at ¶ 7.

6. Defendant's Statement of Material Facts as to Which There is No Genuine Issue ("Defendant's Statement") at ¶ 7.

7. *See* Plaintiff's Counter Statement at ¶ 7; Defendant's Statement at ¶ 7.

8. Plaintiff's Counter Statement at ¶ 8; Defendant's Statement at ¶ 8.
   On November 12, 1986, Gould received an administrative subpoena from the GSA's Office of Investigations.

9. *See* Exhibit 1 to Plaintiff's Complaint; Plaintiff's Statement of Material Facts as to Which There is no Material Issue at ¶ 8.

FOIA.[10] According to defendant, access to the audit reports and related documents was denied to plaintiff because they:

> ... contain the names of witnesses and sources of information and also consist of records furnished in confidence to the OIG by these sources. The documents also contain auditor Duvernay's opinions and articulations of his suspicions of fraud which resulted from information gathered during the post-award audits, including information provided by Gould employees.

*See* Cavallo Declaration at ¶¶ 7–8; Defendant's Statement at ¶ 9. After exhausting its administrative appeals,[11] plaintiff filed this action on May 15, 1987.

## ANALYSIS

The Freedom of Information Act was enacted by Congress in 1966, and substantively amended in 1974, 1976 and 1986 to provide a statutory right of public access to documents and records held by federal government agencies. The Act sets forth "a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *Federal Bureau of Investigation v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed. 2d 376 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978)). The FOIA requires disclosure of requested records and documents unless the requested material fits within one of the nine statutory exemptions set out in subsection (b), 5 U.S.C. § 552(b).[12]

This case concerns the appropriate interpretation of Exemption 7, as applied to the GSA. The seventh exemption of FOIA provides in relevant part that:

(b) This section does not apply to matters that are:

\*   \*   \*   \*   \*   \*

> (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information
>
> (A) could reasonably be expected to interfere with enforcement proceedings. . . .

5 U.S.C. § 552(b)(7)(A) (as amended in 1986 by Pub.L. 99–570). In order to fall within Exemption 7(A), records or information must be "compiled for law enforcement purposes" and it must be established by the agency that their production "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A); *Abramson*, 456 U.S. at 622–23, 102 S.Ct. at 2059–60; *Bevis v. Department of State*, 801 F.2d 1386, 1388 (D.C. Cir.1986).

### A. *The Records Were Compiled for Law Enforcement Purposes*

■ Defendant has suggested two related, but independent bases for finding that the audit reports were "compiled for law enforcement purposes." First, defendants contend that the original drafting of the audit reports by Duvernay and the Office of Audits constituted a compilation of records for law enforcement purposes. In the alternative, assuming that the documents were not initially prepared for law enforcement purposes, defendant contends that the subsequent inclusion—or compilation—of these materials into an active law enforcement investigative file satisfies this threshold requirement. I consider each argument in turn.

---

10. *See generally* Exhibits 1 and 2 of Plaintiff's Complaint; Defendant's Statement at ¶¶ 10–11.

11. *See* Exhibits 3 and 4 to Plaintiff's Complaint (February 10, 1987 appeal letter from Gould to GSA; March 25, 1987 denial of plaintiff's appeal by GSA on the ground that the records requested were exempt under Exemption 7(A)).

12. *See also Abramson,* 456 U.S. at 621, 102 S.Ct. at 2059 ("Congress realized that legitimate governmental and private interests *could* be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused."); *Hobart Corp. v. EEOC,* 603 F.Supp. 1431, 1438 (S.D.Ohio 1984) (collecting cases).

### 1. The Original Preparation of the Reports

Determining whether records have been compiled for law enforcement purposes often requires a careful analysis of the functions of the agency involved. As the D.C. Circuit has emphasized, "it is important to distinguish an agency serving principally the cause of criminal law enforcement from one having an admixture of law enforcement and administrative functions." *Birch v. United States,* 803 F.2d 1206, 1209 (D.C. Cir.1986). *See also Pratt v. Webster,* 673 F.2d 408, 416–18 (D.C.Cir.1982). When evaluating agency claims that a record or document has been compiled for enforcement purposes, the D.C. Circuit has utilized different criteria depending on the agency's "primary mission." *Birch,* 803 F.2d at 1209. When an agency's primary function is law enforcement, agency "claims of satisfaction of Exemption 7's threshold requirement call for less rigorous scrutiny." *Pratt v. Webster, supra,* 429 F.2d at 413–421; *Birch, supra,* 803 F.2d at 1210.

In contrast, the D.C. Circuit has articulated a more demanding standard for application to agencies, such as the GSA, and for that matter the GSA's Office of Inspector General, having an admixture of law enforcement and administrative functions. In the leading FOIA Exemption 7 case requiring the D.C. Circuit to determine whether a mixed-function agency had a "law enforcement purpose" in generating certain records, the D.C. Circuit differentiated between "general agency oversight (including program monitoring) and agency investigations specifically directed at allegedly illegal activity." *Pratt v. Webster, supra,* 673 F.2d at 419 (interpreting *Rural Housing Alliance v. United States Department of Agriculture,* 498 F.2d 73 (D.C.Cir.1974)). In *Rural Housing Alliance,* which involved a report by the Department of Agriculture's Inspector General regarding allegations of housing discrimination, the panel described investigations that satisfy the Exemption 7 "law enforcement test" as "investigations which focus directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions." *Id.* at 81 (footnote omitted).[13] In reaching that conclusion, the court emphasized that, "[t]he purpose of the 'investigatory files' is thus the crucial factor." *Id.* at 82.[14] If the records are accumulated or generated in the course of "an inquiry as to an identifiable possible violation of law," *Birch, supra,* 803 F.2d at 1210, then they are eligible for protection under Exemption 7.

In this case, the initial post-award audits of Gould were principally conducted by Duvernay, who was a part of the staff of the GSA's Office of Audits. In completing these audits, the degree of cooperation and support Duvernay received from the Office of Investigations is a matter of dispute. The ensuing enforcement investigation has been conducted by the GSA's Office of Investigations (in cooperation with the United States Attorney's Office of San Francisco).

---

**13.** *See also Center for National Policy Review v. Weinberger,* 502 F.2d 370, 373 (D.C.Cir.1974), where Judge Leventhal wrote:

> There is no clear distinction between investigative reports and material that, despite occasionally alerting the administrator to violations of the law, is acquired essentially as a matter of routine. What is clear, however, *is that where the inquiry departs from the routine and focuses with special intensity upon a particular party, an investigation is under way.*

(emphasis added).

**14.** The *Rural Housing Alliance* court recognized the danger of a broad or imprecise construction of Exemption 7's requirement that the records of a mixed-function agency be compiled for law enforcement purposes:

> On its face, exemption 7's language appears broad enough to include all such internal audits. If this broad interpretation is accepted, however, we immediately encounter the problem that most information sought by the Government about its own operations is for the purpose of ultimately determining whether such operations comport with applicable law, and thus is "for law enforcement purposes." ... But if this broad interpretation is correct, then the exemption swallows up the Act ...

*Id.,* 498 F.2d at 81. *See also Birch, supra,* 803 F.2d at 1209; *Stern v. F.B.I.,* 737 F.2d 84, 89 (D.C.Cir.1984).

Plaintiff contends that the entity which performed the post-award audits, the Office of Audits, is neither a law enforcement agency (or sub-agency entity) nor a mixed function agency or (sub-agency entity). According to plaintiff, the Office of Audits is without any law enforcement functions or responsibilities. As a result, according to plaintiff, by definition, documents and records which the Office of Audits generates or compiles cannot qualify under Exemption 7. In addition, Gould asserts that the post award audits conducted by Duvernay—and for that matter, *all* the audits conducted by the Office of Audits—are "routine" contract audits because of the identity of who performs these audits.[15] Based on these two assertions, plaintiff syllogistically claims that the records it has requested "were not 'compiled for law enforcement purposes' within the meaning of 5 U.S.C. § 552(b)(7)."[16]

Plaintiff's contention that the Office of Audits is without the capacity to generate or compile documents for law enforcement purposes is overly formalistic and artificial. It ignores the realities of the relationship between the two halves of the OIG—Audits and Investigations. As defendant GSA correctly argues:

... notwithstanding that a primary function of the GSA Office of Audits is the auditing of pre-award offers and compliance with the terms and conditions of a contract after award, there is a *natural overlap* with the Office of Investigations when the auditors begin to detect and suspect specific violations of law by a company or individuals.... the two offices work together and cooperate when a contract audit reveals suspected irregularities.

Defendant's Summary Judgment Brief at 11–12. *See also* Cavallo Declaration at ¶ 2; Duvernay Declaration at ¶ 17. Merely because Duvernay is a staff member of the Office of Audits—and not the Office of Investigations—does not preclude his work-product—which may be the same or similar to that generated by his peers on the staff of the Office of Investigations—from qualifying for Exemption 7.

Therefore, considered realistically, the Office of the Inspector General is a "mixed function agency." Each of its functional arms investigates compliance with the law and both have the capacity to generate records for law enforcement purposes. The particular factual circumstances of a given investigation, and not the identity or title of the investigator, dictate whether the records generated are compiled for law enforcement purposes or are merely produced as part of a routine monitoring exercise. Granted, the majority of the work product generated by the Office of Investigations may be records "compiled for law enforcement purposes." That fact, however, does not in any way preclude the Office of Audits, under certain circumstances, from also compiling such records. Hence, it may be relevant to the *Rural Housing Alliance* analysis, but it is certainly not dispositive of that analysis, that the audit reports at issue were prepared principally, and perhaps entirely, by the Office of Audits.

Whether the post-award audits were initially generated as part of a "routine contract audit" or as part of a "law enforcement investigation" into "specific suspected violations of the law"[17] is not easily

---

**15.** *See* Plaintiff's Summary Judgment Brief at 8.

**16.** *Id.*

**17.** Differentiating records generated pursuant to routine administrative functions from records compiled as part of an inquiry into specific suspected violations of law, a methodology initially used by the *Rural Housing Alliance* court, has become the accepted method for determining whether or not records of a mixed function agency qualify for Exemption 7. *See Rural Housing Alliance, supra,* 498 F.2d at 81–82; *Pratt v. Webster, supra,* 673 F.2d at 419 (citing *Rural*

*Housing Alliance*); *Birch, supra,* 803 F.2d at 1209–1210 ("Exemption 7 embraces only 'investigations which focus directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions.'") (citing *Rural Housing Alliance*). *Center for National Policy Review on Race and Urban Issues v. Weinberger,* 502 F.2d 370, 373–74 (D.C.Cir.1974) ("... where the inquiry departs from the routine and focuses with special intensity upon a particular party, an investigation is under way."); *Goldschmidt v. United States Agricultural Depart-*

determined on the basis of the record before me. There is apparently no dispute that the initial pre-award audit of Gould's fourth contract, GS–00F–78072, began as a routine audit. There is also no dispute that the current investigation of Gould constitutes a law enforcement investigation—and that any records currently being generated or compiled therein meet the *Rural Housing Alliance* test. The issue that the parties seek to have decided is *when* the GSA's initially routine auditing of Gould changed in character into a law enforcement investigation.

According to plaintiff, the fact that the audits were conducted by the Office of Audits necessarily means that they were "routine" and could not possibly have focused on specific acts of wrongdoing. Plaintiff contends that the change in character of the investigation therefore must have occurred sometime after the written audit reports were formally presented to the Office of Investigations. In addition, plaintiff contends that the routine auditing process could only be transformed into an investigation of specific alleged acts of wrongdoing by formal notice by GSA notifying Gould of a law enforcement investigation—and that such notice was first given Gould in November, 1986, when it received the GSA's Inspector General's subpoena for documents.[18]

Neither of these arguments has merit. As discussed above, the Office of Audits has the capacity to perform other than routine functions. The investigation could have changed in character while Duvernay was in the process of investigating and drafting the audit reports. As discussed at some length in the Oral Argument,[19] al-

though the failure to provide formal notice to Gould that it was under investigation may have repercussions not relevant to this case, such notice is not a prerequisite for the initiation of a law enforcement investigation.[20] The appropriate focus for determining when a law enforcement investigation is initiated is on the intentions and actions of the investigators. Attention directed toward the perceptions of the target(s) of the investigation is misplaced.

Defendant, for its part, contends that the contract audits conducted by Duvernay were not routine because: 1) the earlier pre-award audit had uncovered possible violations of law; 2) the Office of Investigations had expressed interest in Duvernay's findings and asked to be kept informed; 3) the audits focused on a specific party and specific potential violations of law; and 4) the audits triggered a subsequent criminal investigation and are now an integral part of that investigatory file. *See* Defendant's Summary Judgment Brief at 13–14. Based on these four factors, defendant readily distinguishes those "routine monitoring" cases relied upon by plaintiff—in which courts find certain records to have been prepared as a matter of routine. *See* Defendant's Summary Judgment Brief at 12–14 (distinguishing *Goldschmidt v. Department of Agriculture,* 557 F.Supp. 274 (D.D.C.1983) (routine monthly inspection reports of meat and poultry plants not covered by Exemption 7); *Hatcher v. United States Postal Service,* 556 F.Supp. 331 (D.D.C.1982) (contract negotiation material obtained as part of routine contract administration and general interpretations of agency policies and regulations not covered by Exemption 7)).[21]

---

*ment,* 557 F.Supp. 274, 276 (D.D.C.1983); *Hobart Corp. v. EEOC,* 603 F.Supp. 1431, 1443 (S.D.Ohio 1984) (collecting cases).

**18.** *See generally* Plaintiff's Summary Judgment Brief at 9–10.

**19.** *See* Transcript of Oral Argument at 39–42, 47–48.

**20.** Defendant, of course, argues that despite the lack of any formal notice, plaintiff was well aware that the audits were being conducted for law enforcement purposes. *See* Defendant's Summary Judgment Brief at 14, n. 4.

**21.** Other cases involving routine records which were held not subject to Exemption 7 include: *Metropolitan Life Insurance Co. v. Usery,* 426 F.Supp. 150 (D.D.C.1976), *cert. denied,* 431 U.S. 924, 97 S.Ct. 2198, 53 L.Ed.2d 238 (1977); *aff'd sub nom., NOW v. Social Security Administration,* 736 F.2d 727 (D.C.Cir.1984); *Stern v. Small Business Administration,* 516 F.Supp. 145 (D.D.C.1980).

I agree with defendant's position that the audit reports were not prepared as a matter of routine. At the time these reports were in the process of being completed—and perhaps even when they were initiated—GSA's inquiry had "departed from the routine" and had "focuse[d] with special intensity" upon specific Gould activities.[22] An investigation was underway.

Pre and post audits are an integral part of the government contracting process. An agency can only carry out its mission in the public interest if these audit investigations are thoroughly and meticulously conducted with an appropriate degree of healthy skepticism designed to expose wrongdoing if it exists. While an ultimate law enforcement investigation may not be the critical objective of this audit process, it clearly is a real possibility. And until this audit process is completed—with the result that no further proceedings are recommended—these audits have the requisite law enforcement tilt to them which should cloak them with Exemption 7 protection. This, however, need not be the only holding in this case because of what follows.

### 2. The Compilation of the Reports Into The Law Enforcement File

■ The issue here is essentially whether records compiled by an agency, as part of an investigation of acts of possible misconduct which eventually develops into a law enforcement investigation, may qualify under Exemption 7(A) as "records compiled for law enforcement purposes." Plaintiff, relying on what it terms "well established precedent" and its reading of the 1974 amendments to the FOIA, contends that "an agency's original purpose in gathering the information contained in or generating the documents requested under the FOIA, and not its ultimate use of the documents, determines whether they may be withheld on the grounds that they are 'compiled for law enforcement purposes' under 5 U.S.C. A. § 552(b)(7)." Plaintiff's Reply Brief at 13–14 (citations omitted). Defendant, contends that "the pre-[1986] amendment precedent on which plaintiff relies is not dispositive." Defendant's Summary Judgment Brief at 17.

A canvass of the relevant precedents shows that at no time has the plain meaning of the statute required an exclusive focus on whether records or information was *originally* compiled for law enforcement purposes. Rather, in determining whether materials can be covered under Exemption 7, the Act permits consideration of subsequent uses and compilations of those materials—including the possibility that materials originally collected for a benign purpose will eventually be compiled or incorporated into a law enforcement investigatory file. The legislative history of the 1974 amendments evinces no intent to alter or narrow the test for whether documents were compiled for "law enforcement purposes." Furthermore, there is no basis in policy or common sense for the narrow construction of the statute advocated by plaintiff.

#### a. *The Statute and Policy*

Plaintiff's contention that the original purpose in collecting materials controls whether such materials are "compiled for law enforcement purposes" would render it irrelevant how that information is eventually used and compiled—or re-compiled. In effect, plaintiff's construction of the term compiled would introduce an artificial cutoff point for determining when a document or piece of information had been compiled for law enforcement purposes—and would essentially introduce the adjective "originally" into the statute to modify the term "compiled for law enforcement purposes." The introduction of such a narrowing term would undercut Congress' deliberate selection of the word "compiled" for usage in the statute. According to Webster's Ninth Collegiate Dictionary, the word "compile" means:

> to collect and edit into a volume; to compose out of materials from other doc-

---

22. *Center for National Policy Review v. Weinberger,* 502 F.2d 370, 373 (D.D.C. 1974) (Leven-

thal, J.) (*see supra,* n. 13).

uments; to run (as a program) through a compiler; to build up gradually ... (1985). A compilation of information or materials "compiled" for law enforcement purposes therefore can be "composed out of materials from other documents"—including other documents already generated or collected by the government for non-law enforcement purposes. Therefore, materials originally drafted, generated or even compiled for one purpose—even if that purpose is benign—subsequently can be "compiled for law enforcement purposes."

The fact that the source of the requested materials—that is, the audit reports and supporting materials—was other government files and records—rather than, for instance, newspapers or other materials in the public domain—has no bearing on whether the materials can qualify for Exemption 7 once they hold an important office in an ongoing criminal investigation. Materials in a criminal or other law enforcement file can emanate from a number of different sources, some even from the public domain, which may in themselves be benign—such as newspaper articles. Some materials may emanate from government agency files—which of course, are themselves often largely compilations of documents and pieces of information that are derived from the public domain. Among those materials compiled in the course of a law enforcement investigation, there is no basis to draw a distinction between those which are drawn directly from the public domain and those which are drawn from materials already collected from the public domain in the course of other government "collection activity."

Plaintiff argues that the incorporation of the word "originally" into the statute is justified by the fact that the materials sought, when they were allegedly part of the routine audit file, were readily available had a FOIA request been made at that time. This prior availability, plaintiff contends, renders contradictory defendants' contention that disclosure of these audit reports now will interfere with an ongoing criminal investigation. This argument is without merit.

Information drawn from a number of different sources can be benign when separately considered. When combined, or "compiled for law enforcement purposes," however, these various pieces of information can indeed become accusatory. As a direct result of their becoming accusatory in nature, these materials may qualify for Exemption 7 of FOIA for their release may interfere with an ongoing law enforcement investigation. Hence, even though the component, derivative parts of a criminal investigatory file, when considered independently and without reference to the remainder of the materials in the investigatory file, may not be covered by any exemption from FOIA, those materials, once combined and incorporated in a law enforcement "mosaic," may well be entitled to Exemption 7.[23]

Plaintiff's argument would require an artificial distinction to be made regularly—in order to deny Exemption 7 to those materials in an active law enforcement investigatory file originally compiled for a purpose other than law enforcement. In order to avoid withholding documents originally compiled for non-law enforcement purposes, agencies frequently would have to separate out from its investigatory files those materials obtained from non-exempt government sources—such as routine internal audits. These materials, of course, would then be privy to disclosure regardless of the impact of such disclosure on an ongoing criminal investigation. Only by undertaking such a process could the agency comply with plaintiff's reading of the FOIA. The making of such distinctions among materials based on their sources is not appropriate, is not required by the FOIA or the caselaw, and clearly was not contemplated by the legislators who enacted and amended the FOIA.

---

**23.** In addition, of course, plaintiff may not circumvent the effect of Exemption 7 by seeking information in the investigatory file from other unprotected government sources. Merely because other copies exist in government files does not strip these documents—and the information they contain—of their exemption from disclosure.

Without doubt, Congress' use of the term "compiled" was designed to avoid inflicting on agencies the painstaking and fact-intensive task of parsing exactly when an investigation like the one at issue here was transformed from the routine to law enforcement in character. Were plaintiff's construction of the statute to control, such a retrospectively oriented parsing often would be required to differentiate those documents originally generated as a matter of routine from those acquired or created after an investigation became law enforcement in nature—even though all such materials eventually were compiled or incorporated in an active investigatory file for legitimate and non-pretextual reasons.

Moreover, the release of those documents originally gathered by the government for purposes other than law enforcement—regardless of the impact of such a release on ongoing law enforcement efforts—does not seem to serve any rational, worthwhile purpose. Plaintiff has not come forth with any policy basis for justifying the expense and effort of separating out materials based on the manner and context in which they were originally obtained or generated by the government.[24]

The process of determining whether a document is "compiled for law enforcement purposes," thus, must focus on where a document or record is *currently* bona fide in place. At a minimum, that means where it is "performing" at the time a FOIA request is made on the agency. In certain cases, it may mean the focus must be on the document's or record's "performance" at a later time, even up to the time that the matter is before a court. Hence, where documents or records are positioned in a particular investigation and that they are

of interest to investigators is extremely important "intelligence." It entitles them to protection so that the investigation can proceed unobstructed.

In this case, as outlined above, at the time Gould requested these materials from the GSA, a law enforcement investigation was already fully underway. This investigation arose out of an audit of Gould which had been conducted by the GSA. The final audit reports provided by Duvernay to the Office of Investigations—which are the target of Gould's FOIA request—were the basis and starting point for the law enforcement investigation.[25] The material circumstances thus are materially different—both now and at the time of Gould's FOIA request—from those that prevailed during the time when GSA was merely conducting a routine audit of Gould. Because a criminal investigation is ongoing and the documents at issue have been incorporated (or compiled) into the active investigatory file, the documents are eligible for coverage under Exemption 7.

### b. *The Legislative History*

Despite the plain meaning of the word "compiled," plaintiff contends that "Congress amended exemption 7 in 1974 to substitute the term 'investigatory *records* [compiled for law enforcement purposes]' for 'investigatory *files* [compiled for law enforcement purposes]' in order to make clear that materials generated in the course of routine government operations are not made exempt simply by being placed in the *file* of the subsequently initiated law enforcement investigation." Plaintiff's Summary Judgment Brief at 16 (emphasis added by plaintiff); *see also* Plaintiff's Reply Brief at 12.[26]

---

**24.** Sorting materials based on the character of the process by which they were originally collected or generated by the government, aside from being without either any basis in the statute or any policy rationale, also would be a difficult, time-consuming and resource-draining exercise in line drawing.

**25.** The reports are very likely among the most central and sensitive documents compiled by the investigators during the early stages of the law enforcement investigation.

**26.** Defendant, in contrast, asks me to interpret the 1986 congressional amendments as enlarging the universe of records or information which may qualify under the "compiled for law enforcement purposes" test. *See* Defendant's Summary Judgment Brief at 15–16. The 1986 amendments removed the word "investigatory" from the phrase "investigatory records compiled for law enforcement purpose," and inserted the words "or information" after the word "records" so that § 552(b)(7) now exempts "records or information compiled for law enforcement purposes."

The objective of the 1974 amendments, in fact, was to deal with an altogether different problem. The 1974 amendments were not intended to change the threshold "compiled for law enforcement purposes" test.

As the Supreme Court outlined in detail in *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 226–236, 98 S.Ct. 2311, 2319–23, 57 L.Ed.2d 159 (1978), Congress amended Exemption 7 in order "to respond to four decisions of the District of Columbia Circuit" ... which held that "the investigatory file exemption was available even if an enforcement proceeding were neither imminent nor likely either at the time of the compilation or at the time disclosure was sought." *Id.* at 228, 98 S.Ct. at 2320.[27] According to Senator Hart, the principal sponsor of the 1974 amendments to Exemption 7, these cases "erected a 'stone wall' against public access to materials in investigatory files." *Id.* According to the Court:

> Senator Hart believed that his amendment would rectify these erroneous judicial interpretations and clarify Congress' original intent in two ways. First, by substituting the word "records" for "files," it would make clear that courts

had to consider the nature of the particular document as to which exemption was claimed, in order to avoid the possibility of impermissible "commingling" by an agency's placing in an investigatory file material that did not legitimately have to be kept confidential. Second, it would explicitly enumerate the purposes and objectives of the Exemption, and thus require reviewing courts to "loo[k] to the reasons" for allowing withholding of investigatory files before making their decisions.... As Congressman Moorhead explained to the House, the Senate amendment was needed to address "recent court decisions" that had applied the exemptions to investigatory files "even if they ha[d] long since lost any requirement for secrecy."

> Thus, the thrust of congressional concern in its amendment of Exemption 7 was to make clear that the Exemption did not protect material simply because it was in an investigatory file.

*Robbins, supra,* 437 U.S. at 229–30, 98 S.Ct. at 2320–21 (citations to 1975 Freedom of Information Source Book omitted).[28]

---

Although some courts have construed these amendments as generally broadening the scope of materials eligible for Exemption 7, plaintiffs interpret the amendments as precisely dealing with a more specific problem. *Compare Irons v. Federal Bureau of Investigation,* 811 F.2d 681, 687 (1st Cir.1987) (citing statement of Senator Hatch that the avowed purpose of the 1986 amendments to Exemption 7 was, "enhancing the ability of all Federal law enforcement agencies to withhold additional law enforcement information ... [and] to broaden the reach of this exemption and to ease considerably a Federal law enforcement agency's burden in invoking it"); *Curran v. Department of Justice,* 813 F.2d 473 (1st Cir.1987) ("drift" of 1986 amendments is "to ease—rather than increase—the government's burden in respect to Exemption 7(A)" ... amendments use "slightly more relaxed phraseology"); *Korkala v. United States Department of Justice,* Civil Action No. 86–0242 (D.D.C. July 31, 1987), Memorandum Opinion at 6, *with* Plaintiff's Reply Brief at 13–14 ("Congress specifically intended the change to reverse two cases holding that law enforcement manuals were not exempt because the information contained in the manuals, although compiled for general law enforcement purposes by a law enforcement agency, was not compiled in the course of a specific investigation."); *King v. United States Department of Justice,* 830 F.2d 210, 229, n. 141 (D.C.Cir.1987) (1986 amendment to Exemption

7 "does not affect the threshhold question of whether 'records or information' withheld under (b)(7) were 'compiled for law enforcement purposes'") (citing and recounting legislative adoption of Senate Judiciary Committee Report No. 221, 98th Cong., 1st Sess. 23 (1983) *reprinted in relevant part in* 132 Cong.Rec. H9466 (daily ed. Oct. 8, 1986)).

Because no court, however, has viewed the 1986 amendments as in any way narrowing the scope of Exemption 7, they need be discussed no further. Reliance on them is unnecessary to reach the holding in this case.

**27.** The four cases cited were: *Center for National Policy Review on Race and Urban Issues v. Weinberger,* 502 F.2d 370 (1974); *Ditlow v. Brinegar,* 494 F.2d 1073 (1974); *Aspin v. Department of Defense,* 491 F.2d 24 (1973); *Weisberg v. United States Department of Justice,* 489 F.2d 1195 (1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). *See generally Robbins, supra,* 437 U.S. at 227–29, 98 S.Ct. at 2319–21 (discussing cases).

**28.** According to a witness from the American Civil Liberties Union, "[w]hat is being gotten at here ... is the old investigatory files, the dead files, the files that are yellowing in the Justice Department and the FBI...." 2 Hearings on S. 1142 *et al.* before the Subcommittees on Admin-

Hence, the thrust of the 1974 amendments was not to reformulate the threshold "compilation" requirement of Exemption 7. Rather, the amendments were designed to require agencies and courts to stop applying the exemption in a "wooden" "mechanical," and literal manner. *Id.* at 230, 98 S.Ct. at 2321. As the Court emphasized, moreover, the debate over the 1974 amendments indicates they were never intended to permit the release of materials in investigatory files if such release would undercut law enforcement efforts:

> The tenor of this description of the statutory language clearly suggests that the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against. Indeed, Senator Hart stated specifically that *Exemption 7(A) would apply "whenever the Government's cases in court—a concrete prospective law enforcement proceeding—would be harmed by the premature release of evidence or information ....."*

*Robbins,* 437 U.S. at 232, 98 S.Ct. at 2322 (citation omitted) (emphasis added). At no point in the debate did any legislator suggest that in such cases Exemption 7(A) would apply only if the potentially damaging materials were *originally* compiled for law enforcement purposes.

Nevertheless, plaintiff contends that the interpretation of the legislative history of the 1974 amendments set forth in two district court cases, *Goldschmidt v. United States Department of Agriculture,* 557 F.Supp. 274 (D.D.C.1983); *Hatcher v. United States Postal Service,* 556 F.Supp. 331 (D.D.C.1982), supports the contention that only materials *originally* compiled for law enforcement purposes can be protected by Exemption 7. According to the *Hatcher* court, "one of Congress' explicit purposes in substituting the term 'record' for 'file' in exemption 7 was to make clear that materials generated in the course of routine government operations could not be protected by commingling them with investigative materials generated by a subsequently-initiated law enforcement investigation." [29] 556 F.Supp. at 335.

In turn, relying on that interpretation of Congress' intent in amending Exemption 7, the *Hatcher* court permitted a target of a criminal investigation to have access to documents "performing" in an active criminal investigation that originally had been compiled or created by the government prior to the initiation of that investigation. According to that court, such a result was unavoidable because documents "not initially created or compiled for law enforcement purposes" cannot "acquire[ ] investigative significance as the result of initiation of the criminal investigation against plaintiff and his company." *Hatcher, supra,* 556 F.Supp. at 334–35.

istrative Practice and Procedure and Separation of Powers of the Senate Judiciary Committee and the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 93d Cong., 1st Sess., 40 (1973) (statement of John Shattuck, ACLU staff counsel) (as cited in *Robbins, supra,* 437 U.S. at 230, n. 11, 98 S.Ct. at 2321, n. 11). *See also Fedders Corp. v. Federal Trade Commission,* 494 F.Supp. 325, 328, n. 4 (S.D.N.Y.1980) ("The 1974 amendments to the FOIA made it clear that exemption 7(A) applied only to records for an active or pending law enforcement proceeding and did not serve to 'endlessly protect material simply because it was in an investigatory file.'") (quoting *Robbins, supra,* 437 U.S. at 230, 98 S.Ct. at 2321).

**29.** The principal basis offered for such a conclusion was Senator Hart's statement that retention of the term "file" would arguably:

allow an agency to withhold all the records in a file if any portion of it runs afoul of [the specific criteria for withholding investigatory records established by the amendment]. It is precisely this opportunity to exempt whole files which gives an agency incentive to commingle various information into one enormous investigatory file and then claim it is too difficult to sift through and effectively classify that information.

*Hatcher, supra,* 556 F.Supp. at 335 (citing 1975 Source Book at 451). Unless Exemption 7 was amended, Senator Hart was concerned that information such as "meat inspection reports, civil rights compliance information, and medicare nursing home reports will be considered exempt under the seventh exemption." *Hatcher,* 556 F.Supp. at 33 (quoting 1975 Source Book).

I am in full agreement that Congress, by replacing the word "record" with the word "file" may have sought to prevent agencies from commingling *otherwise* benign materials in law enforcement files as a basis for protecting them from public disclosure under the umbrella of Exemption 7. It is therefore necessary to look beyond where a document is initially filed both to how it is currently compiled, or "performing," and the dangers of releasing it. One of Congress' central purposes in substituting the word "records" for the word "files" was to " 'make clear that courts had to consider the nature of the particular document as to which the exemption was claimed, in order to avoid the possibility of impermissible 'commingling' by an agency's placing in an investigatory file material that did not legitimately have to be kept confidential.' " *Hatcher, supra,* 556 F.Supp. at 337, n. 7 (quoting *Robbins, supra,* 437 U.S. at 229–30, 98 S.Ct. at 2320–21). The focus must be on a particular record—not the file. The thrust of the 1974 amendments, after all, was to put an end to the mechanical, rigid, wooden granting of exemption to all materials found in any investigatory file.

By the same token, however, there is no basis to read Senator Hart's statements as implying the creation of any new wooden rigid rules for the application of Exemption 7—including a litmus test that would require the release of any materials *originally* compiled by a government agency for a purpose other than law enforcement *no matter how* such materials are presently being used. As one court has noted in holding documents currently "performing" in a law enforcement proceeding to be covered under Exemption 7, and in rejecting an argument similar to the one being promoted by plaintiff Gould:

The documents sought in the instant action, though unsolicited when first received, have become an important part of the record compiled by the FTC for an ongoing investigation. To follow the logic of the plaintiff and exclude these documents from the scope of exemption 7(A) simply because of the manner in which they were received, and despite the fact that they were, at the time requested, an important element in the record of an active investigation, would be to exalt form over substance and to defeat the purpose for which the amendment was enacted.

*Fedders, supra,* 494 F.Supp. at 328.[30] In short, regardless of how the government originally comes into the possession of documents or information, where those:

... documents or information are later compiled into a record for a pending or active investigation, and such investigation is pending or active at the time the request is made, disclosure may be withheld under exemption 7(A).

*Id.* (footnote omitted).

Neither Senator Hart nor any of the other legislators who enacted the 1974 amendments could have envisioned the amendments as requiring the release of, for instance, *every* routine meat inspection report or *every* routinely generated medicare nursing home report—even if such a report had become an integral part of a top secret highly important law enforcement investigation. As discussed above, the amendments were not intended to effect Exemption 7's central purpose of avoiding interference with law enforcement functions—and constructions of the amendments which attribute such an effect to them are without foundation in the legislative history.[31]

**30.** *See also New England Medical Center v. NLRB,* 548 F.2d 377, 386 (1st Cir.1977) (fact that records now relevant to an ongoing investigation were originally generated in a different, closed investigation not germane to whether release will interfere with pending proceeding).

**31.** It may be true that "[t]he term 'record' was not substituted for 'file' to overrule any specific judicial result, but rather [was] based on an apprehension that courts might also liberally

construe the types of materials protected by exemption 7." *Hatcher, supra,* 556 F.Supp. at 337, n. 7. Nevertheless, there is no evidence that the amendments in general, or the substitution of the word "record" for the word "file," in particular, were designed to insure a crabbed construction of the types of materials protected by Exemption 7. The amendments to Exemption 7 were drafted to clarify, not alter the requirements of the 1966 Act—insofar as they dealt with the threshold compilation issue. In

Therefore, leaving aside the issue of whether the audit reports which plaintiff seeks were initially drafted as part of an investigation that had by the time of their drafting become law enforcement in nature, the reports are now an integral part of an ongoing criminal investigation. The present inclusion of these audit reports in the investigatory record or file is the result of the natural and legitimate progression of materials underlying a routine audit—after that audit uncovered potential criminal wrongdoing—to a law enforcement file.[32] These materials therefore are covered by Exemption 7 if their disclosure would interfere with an ongoing criminal investigation. It is to that issue which I now turn.

B. *Disclosure of the Requested Materials Would Interfere With a Law Enforcement Investigation*

The government also has the burden of establishing that release of the requested records "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552 (b)(7)(A); *Bevis v. Department of State,* 801 F.2d 1386, 1388 (D.C. Cir.1986).[33] In "carrying its burden of demonstrating how the release of the withheld documents would interfere" with the investigation of Gould, the GSA "need not proceed on a document-by-document basis."

*Bevis v. Department of State,* 801 F.2d 1386, 1389 (D.C.Cir.1986). Rather, GSA may take a "generic approach,"

grouping documents into relevant categories that are "sufficiently distinct to allow a court to grasp 'how each.... category of documents, if disclosed, would interfere with the investigation.' The hallmark of an acceptable.... category is thus that it is *functional;* it allows the court to trace a rational link between the nature of the document and the alleged likely interference."

*Bevis, supra,* 801 F.2d at 1389 (quoting *Crooker v. Bureau of Alcohol, Tobacco and Firearms,* 789 F.2d 64, 67 (D.C.Cir. 1986); *Campbell v. Department of Health and Human Services,* 682 F.2d 256, 265 (D.C.Cir.1982)). In short, the GSA must accomplish a "three-fold task":

First, it must define its categories functionally. Second, it must conduct a document-by-document review in order to assign documents to the proper category. Finally, it must explain to the court how the release of each category would interfere with enforcement proceedings.

*Bevis, supra,* 801 F.2d at 1389–90.[34]

In this case, the GSA has completed satisfactorily this three-fold task. It has ex-

---

fact, support for this view is found in *Hatcher,* where the court acknowledges, (albeit in the process of denying coverage under Exemption 7 as originally crafted), that the 1974 amendments were not the basis in that case for holding the documents at issue not exempt from the FOIA. *Id.*

**32.** This characterization of the events that have transpired in this case obviously presupposes that the GSA authorities are acting in the utmost good faith. There is nothing in the record to indicate that anything other than the natural progression of events has actually taken place. And there is nothing to suggest that the government has initiated the investigation of Gould as a pretext to avoid disclosure of the materials plaintiff seeks. *See, e.g. New England Medical Center Hospital v. NLRB,* 548 F.2d 377, 385 (1st Cir.1976) ("This is not a case where an agency seeks to bury files which have served their purpose ...").

**33.** The 1986 amendments relaxed the standard of demonstrating interference with enforcement proceedings by requiring the government to show merely that production of the requested records "could reasonably be expected" to inter-

fere with enforcement proceedings rather than requiring a showing that release "would" interfere with such proceedings. *See* Pub.L. 99–570.

**34.** The functional test set forth in *Bevis* and *Crooker* steers a middle ground between the detail required by a so-called "*Vaughn* Index" and the sort of "blanket exemption" prohibited by Congress in 1974. *See e.g. Robbins supra,* 437 U.S. at 236, 98 S.Ct. at 2323 ("generic determinations of likely interference" sufficient); *Curran, supra,* 813 F.2d at 475 ("... in the environs of Exemption 7(A) ... provision of the detail which a satisfactory *Vaughn* Index entails would itself breach the dike. In such straitened circumstances, the harm which the exemption was crafted to prevent would be brought about in the course of obtaining the exemption's shelter. The cure should not itself become the carrier of the disease."); *Crooker, supra,* 789 F.2d at 67 (withholdings must be justified "category-of-document by category-of-document ... not ... file-by-file"); *Hatcher, supra,* 556 F.Supp. at 333 ("It is not necessary, under exemption 7, to show that interference with enforcement proceedings is likely to occur in this case if those documents are disclosed. It is

plained its decision to withhold the requested materials in sufficient detail for this court to understand how disclosure would likely interfere with its ongoing investigation of Gould. According to defendant, the requested documents contain the names of witnesses and sources of information. They also consist of records provided by these sources. These sources are unknown to Gould.[35] The documents also contain the opinions and reasoning of the principal auditor, Duvernay, regarding his suspicions of fraud.[36]

Production of these records to Gould, the target of an ongoing criminal investigation, would interfere with the enforcement proceeding in several ways. First, disclosure would have a chilling effect on potential witnesses. It would also increase the possibility of interference with witnesses. The fact that Gould employees are the source of information increases the likelihood of both such chilling and such interference. Second, disclosure would reveal the nature and focus of the investigation and would provide Gould with the opportunity to unduly interfere with the natural progression of the investigation.[37]

This sort of interference with an ongoing criminal investigation is precisely what Exemption 7 is designed to prevent. As the Supreme Court stated in *Robbins:*

> The most obvious risk of "interference" with enforcement proceedings in this context is that employers or, in some cases, unions will coerce or intimidate employees and others who have given statements, in an effort to make them change testimony or not testify at all.... even without intimidation or harassment a suspected violator with advance access to the Board's case could "'construct defenses which would . permit violations to go unremedied.'"

437 U.S. at 239, 241, 98 S.Ct. at 2325, 2326 (citations omitted). The same risks are present in the context of an ongoing criminal investigation. *See also Hatcher, supra,* 556 F.Supp. at 333, n. 1; *New England Medical Center Hospital v. NLRB,* 548 F.2d 377, 383 (1st Cir.1977).

The FOIA was not enacted, nor was it ever designed to be a discovery device for a target of a criminal investigation.[38] One of

---

enough if the [defendant] has made a generic showing that disclosure of those particular kinds of investigatory records would generally interfere with enforcement proceedings.").

**35.** *See* Cavallo Declaration at ¶ 7.

**36.** *See* Cavallo Declaration at ¶ 8. Defendant also emphasizes that "the names and information provided [by confidential sources] are woven throughout the audit documents and cannot be effectively edited or segregated." Cavallo Declaration at ¶ 7.

**37.** *See generally* Cavallo Declaration at ¶¶ 7–8 (explaining likely impact of disclosure on government's investigation of Gould).

Plaintiff, however, contends there are two reasons unique to this case that should permit Gould to have access to the requested materials. First, plaintiff argues that many of the requested documents underlying the audit reports which are now in the government's possession were taken from Gould's files. Disclosure therefore would be ostensibly harmless. Second, plaintiff claims that at some point, one of its employees, Mr. Carbone, was permitted to review a draft of one of the post-award audit reports. (Defendant contests that allegation and asserts that Mr. Carbone was only allowed to review a sales reconciliation analysis which was not part of the draft audit report. *See*

*generally* Duvernay Declaration at ¶¶ 15–16.) As a result, plaintiff contends, "it is difficult to comprehend how renewed disclosure of the document could compromise or in anyway interfere with enforcement proceedings." Plaintiff's Reply at 23.

Neither of these factors has any special significance. The disclosure of a witness' own statements or records has been refused previously pursuant to Exemption 7(A). *See e.g. Willard v. Internal Revenue Service,* 776 F.2d 100, 103 (4th Cir.1985); *Linsteadt v. Internal Revenue Service,* 729 F.2d 998 (5th Cir.1984) (taxpayers refused access to memorandum of factual statements made by them to I.R.S. agent because release would impair Service's administration of tax laws and interfere with enforcement proceedings). As the *Willard* court emphasized, disclosure of which records were selected by investigators from the universe of available materials for copying or compiling would reveal the nature, scope and focus of the government's investigation. *Willard, supra,* 776 F.2d at 103. Moreover, disclosure would provide Gould with clues about the identity of the government's sources.

**38.** As the Supreme Court stated in *Robbins,* "[f]oremost among the purposes of this Exemption [7] was to prevent 'harm [to] the Government's case in court,' by not allowing litigants

the principal purposes behind Congress' adoption of Exemption 7(A) was "to prevent a litigant from utilizing the FOIA to obtain premature access to the evidence and strategy to be used by the Government in the pending law enforcement proceeding." *Fedders, supra,* 494 F.Supp. at 329; *Robbins, supra,* 437 U.S. at 242, 98 S.Ct. at 2327 ("... FOIA was not intended to function as a private discovery tool ..."). Premature release of the information requested by Gould "would tend to show a litigant the 'outer limits of the [Government's] case,' and thereby allow him to 'anticipate the [Government's] presentation of evidence.'" *Fedders, supra,* 494 F.Supp. at 329 (quoting *New England Medical Center Hospital, supra,* 548 F.2d at 383); *Hunt v. Commodity Futures Trading Commission,* 484 F.Supp. 47, 50 (D.D.C.1979). Plaintiff cannot be permitted to use the Act "as a means of obtaining the release of information which would be protected from discovery in a pending or prospective enforcement proceeding." *Fedders, supra,* (quoting *Kanter v. Internal Revenue Service,* 433 F.Supp. 812, 824 (N.D.Ill.1977)). Production of the records requested by Gould would result in the very harms to enforcement proceedings against which Exemption 7 is designed to protect. To grant plaintiff's unwarranted FOIA request in this case, therefore, would result in a perversion of the Act, and could eventually result in a curtailment of the Act to the ultimate detriment of those in legitimate need of its protection.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.

'earlier or greater access' to agency investigatory files than they would otherwise have." *Robbins, supra,* 437 U.S. at 224–25, 98 S.Ct. at 2318 (citations omitted).